LOUIS SCHIFF and JACOB SACK,

*Plaintiffs,*

SIDNEY SCHWARTZ,

*Intervening Plaintiff,*

*vs.*

RKO PICTURES CORPORATION, HOWARD R. HUGHES, NOAH DIE-
TRICH, JAMES R. GRAINGER, E. L. WALTON, WILLIAM H. CLARK,
GARRETT VAN WAGNER, CHARLES BOASBERG, J. MILLER
WALKER and A. DEE SIMPSON,

*Defendants,*

MILTON FRIEDMAN,

*Intervening Defendant.*

*New Castle, March 26, 1954.*

*Herbert L. Cobin,* Wilmington, *Harry J. Halperin, Samuel L. Scholer,* and *Edmund B. Hennefeld* (of Halperin, Natanson, Shivitz & Scholer), New York City, and *Bernard Buchwald* (of Hoffman, Bondi, Buchwald & Hoffman), New York City, for plaintiffs.

*Russell J. Willard* (of Hastings, Stockly & Walz), Wilmington, *Israel Beckhardt* and *Louis C. Fieland,* New York City, for Sidney Schwartz, intervening plaintiff.

*William S. Potter* and *Richard F. Corroon* (of Berl, Potter & Anderson), Wilmington, *Ralston R. Irvine, Roy W. McDonald* and *Thomas K. Fisher* (of Donovan, Leisure, Newton, Lumbard & Irvine), New York City, for defendant RKO Pictures Corp.

*Robert C. Barab,* Wilmington, and *Nemerov & Shapiro,* New York City, for Milton Friedman, intervening defendant.

No service of process was made on the other defendants.

SEITZ, Chancellor: This is a stockholders' class action to enjoin the corporate defendant from accepting an offer to purchase its assets, and also for the appointment of a receiver. The court was so pressed for a quick decision that it did not have time to write a short opinion.

By letter, dated February 7, 1954, Howard R. Hughes, chairman of the board of RKO Pictures Corporation (hereafter called "RKO"), offered to purchase all of RKO's assets of every kind including claims and causes of action against any person including Hughes for the sum of $23,489,478. Actually RKO is a holding company but since it operates through wholly owned subsidiaries, all parties agree that we should consider the assets as though they were all held by RKO.

The more important terms and conditions of the offer must be here stated. It had to be accepted by the directors on or before February 15, 1954, approved by the affirmative vote of a majority of the stock, other than that owned by Hughes, not later than March 31, 1954, and also approved by a majority of all of the outstanding stock. The transfer of the assets was to be consummated not later than 10 a. m. on April 2, 1954. In his letter, Hughes as the owner of 1,262,120 shares of RKO stock, out of 3,914,913 shares outstanding, agreed to vote his stock to approve the acceptance of the offer and he further promised that at such stockholders' meeting he would vote his stock to reduce RKO's capital by paying $6 in cash per share for all shares other than his own tendered for redemption during the 60 day period following the adoption of the resolution or such longer period as the company's attorneys considered desirable. Hughes also proposed to undertake to protect the stockholders against any liability for corporate debts and he represented that there was no offer outstanding to him for the assets he offered to purchase.

Some of the history of RKO is appropriate background for the determination of this lawsuit. For many years prior to 1948, Radio-Keith-Orpheum Corporation was a successful producer, distributor and exhibitor of motion pictures. In that year the defendant Hughes acquired approximately 30% of the outstanding stock. In 1950, as a result of federal anti-trust action, Radio-Keith-Orpheum was split into two corporations:

1. The defendant RKO, which retained the production and distribution end of the business, and

2. RKO Theatre Corporation, which acquired the exhibition end.

In 1948—the year Hughes became a 30% stockholder—Radio-Keith-Orpheum commenced losing money and lost over $5,000,000 a year for the three following years. After the division in 1950, RKO operations resulted in losses of $600,000 in 1951, about $10,000,000 in 1952, and about $4,500,000 for 1953. The experience so far in 1954 demonstrates a probable loss for this year between $6,000,000 and $7,000,000. Indeed, the credible testimony is that other future losses are probable.

After Hughes bought his substantial stock interest in 1948, he became responsible for the production end of the business. In 1952, Hughes contracted to sell his stock to a Chicago syndicate. He received a down payment and the board resigned and the syndicate took over and new directors were appointed. For reasons not here important the syndicate did not complete the transaction and forfeited the down payment to Hughes. The new board resigned and the previous board was then reelected.

Shortly thereafter, certain stockholders of RKO commenced actions against Hughes and the other directors seeking to recover the money realized by Hughes on the syndicate transaction and seeking an accounting for waste and mismanagement. Certain of the plaintiffs in such actions were the Castlemans who commenced actions in New York, California and Nevada. Hughes and the other directors of the corporation all voluntarily appeared in the Nevada action. They were not served nor did they appear in the other cases.

In August 1953, the present plaintiffs commenced a derivative action in New York against RKO, Hughes and the other directors for waste and mismanagement, claiming damages of $38,500,000. The defendant Hughes was never served in the New York action. The defendant RKO sought a stay of the trial of the New York action because the Nevada trial of similar issues was about to commence. But plaintiffs opposed the stay on the ground that the

Nevada action was not being prosecuted in good faith. The Appellate Division of the New York Supreme Court on January 27, 1954, denied the stay without passing on the merits of the grounds relied upon by the parties.

Then on February 7 came the Hughes' offer. On February 11, Hughes moved in the Nevada court for dismissal of that action with prejudice on the ground that he, by purchasing RKO's assets, would acquire the cause of action against him and the other defendants. It may be noted that this motion was made prior to the date when the directors met to act on the Hughes' offer.

The board of directors of RKO met in Atlanta, Georgia, to act on the Hughes' offer. It convened on February 12, and directors Walker and Simpson resigned. Immediately thereafter, Clark, Van Wagner, Boasberg and Walton were elected directors. These men were all officers and employees of RKO. The remaining directors at the time were Dietrich, Grainger, and Hughes. Dietrich and Hughes were not present and Grainger retired from the meeting before they considered the offer. The personnel changes in the board were made at the suggestion of RKO's counsel to get a majority who were not defendants in any then pending actions. These meetings lasted on the 12th from 2:30 until 6 p. m. and from 8:30 until about 11 p. m. and continued on February 13, from 9 a. m. to final adjournment about 11 a. m. The directors present concluded that the Hughes' offer was fair and should be accepted and recommended to the stockholders.

The stockholders met on March 18 and voted on the question of the acceptance or rejection of the Hughes' offer. 3,358,116 shares were voted out of a total of 3,891,526 shares outstanding and entitled to vote. There were 3,914,913 shares outstanding. With the Hughes' shares included there were 3,284,889 shares voted for and 73,227 shares against the acceptance of the offer. Excluding the Hughes shares, 2,022,769 shares were voted for and 73,227 against the offer. It thus appears that a majority of all of the outstanding stock voted in favor of accepting the Hughes' offer even when we exclude the shares voted by Hughes.

On February 16 this action was commenced against RKO and the board members including the two who resigned at the Atlanta meeting. Only RKO was served with process and the case was tried between March 8 and 11, with the record left open to receive the result of the stockholders' vote at the meeting called for March 18.

Plaintiffs' contentions may be outlined as follows:

1. Hughes dominated and controlled the board of directors that approved the acceptance of his offer; RKO therefore has the burden of showing the fairness of the transaction and this burden is not shifted because of the approval of the acceptance by the holders of a majority of the shares outstanding, without counting the Hughes' shares.

2. Whether RKO has the burden or whether plaintiffs have the burden, the offer is so grossly inadequate as to justify a finding of constructive fraud.

3. The proxy statement contains such false and fraudulent matters that stockholder action induced thereby should be considered meaningless.

4. The sale of assets is tainted with bad faith.

At the conclusion of the trial the intervening plaintiff joined with the corporate defendant and the intervening defendant in urging that the offer was fair by any standard and that no bad faith was shown.

Before considering specific contentions of the plaintiffs, it is desirable to state certain general principles which I believe are here operative. This is a proposed sale of assets under 8 *Del.C.* § 271. While a part of the Hughes' offer was the expression of an intention to vote his shares to cause RKO to redeem shares for $6 per share (which resolution was also passed on March 18), to give particular weight to the contrast between this $6 per share and the market price of about $3 per share prior to the Hughes' offer, is to misconceive the issue. As noted and obviously approved by the Chancellor in his reasoning in *Allied Chemical & Dye Corporation v. Steel & Tube Co. of America,* 14 *Del.Ch.* 1, 120 *A.* 486, the market price on the

stock exchange is not a reliable criterion of the true value of corporate property. I consider RKO's market price to be of minor importance in resolving the issue here.

On the other hand, in connection with the valuation of assets for purpose of sale under the statute, the earning record made by the selling corporation and future prospects based on the use of such assets by the selling corporation and by prospective purchasers are pertinent and important factors. The Chancellor so held in his second opinion in *Allied Chemical & Dye Corporation v. Steel & Tube Co. of America,* 14 *Del.Ch.* 64, 122 *A.* 142. The various pertinent considerations are discussed in that opinion and in applying them, I shall only add that in the final analysis they require the appropriate officers to apply honest and intelligent business judgment standards in discharging their statutory duty.

### Burden of Proof.

Against this background I consider plaintiffs' first contention that the offeror Hughes so dominated and controlled the board that the burden of showing the fairness of the transaction is upon the defendant RKO and did not shift back to the plaintiffs because of any stockholder approval.

A preliminary objection by plaintiffs must be considered. They say the court should not have held the case open to receive the stockholders' vote. I cannot agree. The stockholders' approval was part of the bargain and in fact, there would be no case without such vote. I think it proper evidence to await, to receive and to consider.

The transaction here attacked was approved by vote of a majority of all of the outstanding stock without counting the shares owned by the offeror Hughes. The pendency of this action was noted in the proxy statement and in fact the trial was completed a week prior to the stockholders' meeting with leave granted RKO to supplement the record by including the stockholders' vote. Also, plaintiffs were afforded the opportunity to introduce any further evidence they desired in connection with the stockholders' vote, but they chose not to do so.

■ Passing by for the moment the objection that the stockholders were not fully informed, I therefore assume and conclude for present purposes that the Hughes offer was approved by a legally disinterested group of stockholders owning a majority of all of the outstanding shares. Thus sufficient shares were voted in favor of the offer to meet the statutory requirement without counting the Hughes' stock. This being so, it seems to me that even assuming that, otherwise, RKO would have the burden of showing the fairness of the transaction on the theory that the purchaser Hughes dominated and controlled the board of directors, nevertheless, the independent majority stockholder approval has the effect of shifting that burden back to the plaintiffs. The approach was announced by the Delaware Supreme Court in *Gottlieb v. Heyden Chemical Corp.*, 33 *Del.Ch.* 177, 91 *A.2d* 57, 58, in the following language:

> "Where the directors have represented both themselves and the corporation, and where there was no ratification by stockholders, and the action is thereupon duly challenged, the court will usually have no choice but to employ its own judgment in deciding the perhaps very close and troublesome questions as to whether the evidence shows that the directors in fact used the utmost good faith and the most scrupulous fairness. Where there was stockholder ratification, however, the court will look into the transaction only far enough to see whether the terms are so unequal as to amount to waste, or whether, on the other hand, the question is such a close one as to call for the exercise of what is commonly called 'business judgment'. In the former case the court will reverse the decision of the stockholders; in the latter it will not."

For purpose of considering the *Gottlieb* principle, I shall assume that where it appears that the purchaser in fact dominates and controls the board and the selling corporation then those espousing the transaction would have the burden of showing its fairness, absent independent stockholder approval. It is true that the *Gottlieb* case involved a stock option and that the Delaware statute authorizing options does not explicitly call for both director and stockholder approval, as does the sale of assets statute. However the stock option

plan in the *Gottlieb* case required both and so the principles announced by the court would seem equally applicable.

Because of the stockholder vote, I conclude that plaintiffs to be successful have the burden of showing that the disparity between the money received and the value of the assets sold is so great that the court will infer that those passing judgment are guilty of improper motives or are recklessly indifferent to or intentionally disregarding the interest of the whole body of stockholders. Compare *Allaun v. Consolidated Oil Co.*, 16 *Del.Ch.* 318, 147 *A.* 257.

Fairness of Price.

Plaintiffs contend that the proxy statement sent to the stockholders contained so many material misrepresentations that in effect the stockholders were not fully informed and so their vote of approval should not be given its usual effect. While logically it might seem that this point should be next considered, I believe I should first decide plaintiffs' charge that there is a gross disparity between the Hughes' offering price and the value of the assets. I say this because my conclusions with respect to this issue will bear directly on many of the misrepresentations alleged by plaintiffs.

As stated, four directors voted in Atlanta to accept the Hughes' offer and to recommend its approval by the stockholders. All four directors had years of experience in the moving picture industry and I think it reasonable to conclude that each was quite familiar with his particular aspect of RKO's business and that facet of the industry generally. There was much testimony as to what these men actually considered and evaluated at the Atlanta meeting and whether they had sufficient information to enable them to arrive at an honest and informed business judgment as to the fairness of the offer. Let us see what was considered.

I commence the judicial process here by taking, as did the directors and all the attorneys in the case, RKO's October 3, 1953 consolidated balance sheet showing a book net worth of $22,643,567.31. The directors then proceeded to adjust that figure with various plus and minus value factors deemed by them to be relevant to arrive at

a fair value for sale purposes on March 31, 1954. The Hughes' offer fixed a transfer deadline of 10 a. m. April 2, 1954 and since the directors determined to adopt March 31 as a target transfer date, they adjusted the values to that date.

Plaintiffs argue that the directors should have valued the assets as of February 12, 1954 when the directors accepted the Hughes' offer. It seems to me that the directors acted reasonably under the circumstances in fixing the March 31 date because the acceptance was not complete until approved by the stockholders and it was obvious that such approval would be reasonably related in time to the March 31 date.

The board determined that actual and prospective operating losses from the balance sheet date until March 31, would be $2,500,000 and that this figure plus a duly authorized write-off authorized by the board on December 20, 1953, in the amount of $1,771,847.03, should be deducted from the October 3 book value. Plaintiffs agree with this approach and so we arrive at an adjusted book value after these deductions of $18,371,720. It is upon this figure that plaintiffs say they will impose plus and minus figures to demonstrate a value of assets of RKO far in excess of the Hughes offer. I now examine these factors.

Plus Factor—Real Estate.

RKO has two studio properties. One is located on Gower Street in Hollywood and the other in Culver City, California. Their book value on the October 3 balance sheet amounted to $1,800,000. Their original cost was in excess of $8,000,000. For insurance purposes their value was recently recorded at $7,630,024 exclusive of the land which was carried at $1,163,234.72. It is not clear but apparently one of these figures also included the value of the contents of the studios.

By resolution dated February 1, 1954, RKO's board authorized the proper corporate officials to continue to negotiate for the sale of the Culver City studio and to accept any offer for a price as high as $2,500,000. The resolution makes it entirely clear that unsuccessful

efforts had been made for some time to dispose of the property and that even at that time no offer was imminent. Two directors testified that the Gower Street property was worth more than the Culver City Studio in a ratio of perhaps 65-35. Plaintiffs contend that the board's resolution shows that the directors valued the Culver City Studio at $2,500,000. They proceed from this premise to use the 65-35 ratio of value and conclude that the Gower Street property has a value of at least $4,600,000. They thus arrive at a $7,000,000 value for the two studios. The board, on the other hand, for purposes of considering the Hughes' offer, determined their combined value to be at least $4,800,000. Thus, the disparity amounts to about $2,300,000.

The keystone in plaintiffs' arch of reasoning on this item is the resolution. Since I conclude that this keystone is infirm, it follows that plaintiffs' conclusions therefrom are weak. The resolution was a grant of power unrelated to any specific offer. Indeed the evidence shows that no offer even close to $2,500,000 was ever received for the Culver City Studio, although numerous attempts have been made to sell it. To say that the fixing of $2,500,000 in the resolution is almost conclusive of its value is to lose sight of the importance of value placed on such properties by prospective purchasers. As I view it, the resolution was no more than a continuing grant of power to sell at a figure as to which there could be no question of adequacy. I do not interpret it to mean that the same directors would not have accepted a substantially smaller offer had one been produced.

Another infirmity in plaintiffs' contention is found in the fact that the witnesses in fixing a tentative 65-35 value ratio on the two studios did so in the light of their feeling that the combined value of the two properties was around $5,000,000. The record clearly shows this to be so.

Plaintiffs complain that none of the directors was a real estate expert and that no appraisal was obtained. In view of the intimate knowledge these men had of the RKO assets and in view of the history of the attempted sale of the Culver City property, I am not persuaded that plaintiffs have sustained the burden of showing that the lack of these two factors lends substantial support to plaintiffs' claim. The original cost is of course pertinent but it has a limited

value when one is trying to determine the present sale value of assets. The statement of value appearing in the insurance policy contains within itself a statement that the parties making it were not appraisers and assumed no responsibility for the authenticity of the values shown.

I therefore conclude that plaintiffs have not sustained their burden of showing a gross disparity between the value ascribed to the real estate by the directors and the so-called "real" value of such assets.

### Plus Factor—Blocked Funds.

In January of this year, RKO had about $4,400,000 in block bank balance of foreign subsidiaries. Because of its contingent nature it was not reflected on the balance sheets but was mentioned in footnotes to the annual reports. About half of these funds, when realized, belong to individual producers whose pictures RKO markets abroad. The directors determined that based on experience about one-half of such money would actually be realized. They therefore added a plus of $1,000,000 to the adjusted balance sheet figures in order to show the present value of the portion which RKO might ultimately realize.

The loss in these funds arises from the restraints imposed by the various countries on the conversion of their funds into dollars. Plaintiffs' position is that these funds will be ultimately collected in full and that therefore this plus factor should be $2,000,000 rather than $1,000,000. It seems to me that the short answer here must be that the evidence supports the position taken by the directors. Plaintiffs failed to produce evidence justifying the court in adopting their contention. The result is that plaintiffs have failed to sustain their burden with respect to this factor.

### Plus Factor—"The Robe".

The revised balance sheet sent to the stockholders in connection with the meeting held to vote on the Hughes' offer did not show that under an agreement with 20th Century Fox, RKO was certain to get $519,000 for its share of the profits on a moving picture called "The Robe". Passing over for the present the question as to whether

or not it should have appeared in the revised balance sheet, the fact is that RKO concedes that it is a proper plus factor of $519,000 for purpose of considering the Hughes' offer. RKO says its value is within the value ascribed to the assets. As hereinafter appears, I agree.

### Plus Factor—Film Library.

The admitted valuable asset in the form of the film library is one of the principal items of dispute in this action. The facts are that RKO has a film library consisting of about 700 features and 400 shorts made and released between 1929 and 1952 and as to which it apparently has unlimited rights to make further distribution to conventional theatres. These films are fully amortized and have a book value of $1.00 each.

These films were considered by the directors from the points of view of their reissue value and their television value. The directors fixed no specific value on the film library either for reissue or television purposes, but conceded that it has substantial value. What they did was to fix values for all substantial plus and minus factors other than the plus factor of the film library. After considering all the other plus and minus factors, they determined whether $8,000,000, being the difference between such an aggregate figure and the Hughes' offering price would fairly accommodate the reasonable value of the film library. Other directors offset its value against the anti-trust liability. I proceed to analyze this plus factor.

First, I consider the question of their reissue value.

RKO has reissued about 61 pictures of all types since 1929. Since this has been done over a long period of time extending into the immediate present, I am inclined to accept the testimony of RKO's witness that it has scoured its film library looking for reissue material. While the profits and losses were not put in evidence by agreement of counsel, I infer that their introduction into evidence would not have aided plaintiffs' case since they did not see fit to introduce them.

Plaintiffs rely on one rather successful reissue entitled "King Kong", which made a profit of $565,000. From this premise they argue as follows:

"It is a fair inference, in the absence of proof by defendant, that out of the library of over 700 feature-length films, there are 10 pictures capable of yielding the same $565,000 net as 'King Kong' and accordingly, we contend that a plus factor of $5,650,000 would be proper."

It is of course true that reissues which "catch on" are of substantial value because the costs of making the pictures have already been absorbed. However, my difficulty is that so far as the record shows, RKO's success with "King Kong" was not typical. An attempt to arbitrarily infer that there are at least 10 films with a similar potential is just not warranted by this record. One of RKO's directors who was in charge of reissues, and who said that he combed the inventory of pictures looking for reissue possibilities, said that at this time there were no other money makers. RKO's directors recognize that the reissue rights are valuable but their position is that their current value is small.

I infer from the testimony that it is not so much a fact that reissue rights are of small value, as that they are of speculative value. I say this because of the various new developments in the movie industry, such as Cinerama, Cinemascope, 3-D, as well as the shifts in tastes of movie-goers. All these things make this aspect of this unique business even more difficult to evaluate.

I pause to note that plaintiffs complain of the failure to have the film library valued by an expert. In view of the rather unique and speculative nature of this asset, I think the man who was responsible for this aspect of the business was fully qualified to evaluate it for the board within the limits mentioned. While I recognize that I have here assumed that he was a legally "interested" director, nevertheless, there is no attack upon the substantial facts upon which he relied.

I pass now to a consideration of the value of the film library for purposes of television.

Based upon a great deal of hearsay testimony and other testimony of a most speculative nature, plaintiffs arrive at an "average" of $25,000 per feature picture for television rights. The $25,000 average

is arrived at from testimony summarized from the following quotation from plaintiffs' brief:

"Van Wagner accepted the statement of Walton in an affidavit that the feature-length films of Republic Pictures, with which Walton had been connected (R.259, D.463), brought $18,000 to $20,000 a picture (R.261, D.470), also, that Republic's pictures were inferior to RKO's (R.259, D.464). He admitted that Walton, the man with most experience in the field, might have indicated to the Board that a feature-length picture could bring $35,000 to $50,000 in the television market (R.262, D.465).

"Granger admitted he had made no attempt to sell the television rights (R.262, D.840) and that he had never taken up the advisability of doing so with the Board (R.262, D.841). He admitted he had heard amounts paid for individual pictures ranging from $10,000 to $60,000 (R.262, D.841).

"If we take neither the $60,000 top figure mentioned by Grainger, nor the $35,000 to $50,000 mentioned by Walton, nor the $18,000 to $20,000 for inferior pictures of Republic, but an average of $25,000, we get a total for 700 pictures of approximately $17,500,000. The only evidence in the case as to value supports that sum as the minimum value of the film library for television use."

I shall not analyze the testimony in detail. It is sufficient to say that there is no evidence to support some of the statements and, read in its context, the testimony in no wise warrants the drawing of an average figure of $25,000. Indeed it appears to be undisputed that no major movie producer has sold its films for use on television. Moreover, many of the pictures in RKO's library are restricted, at least for television purposes, by numerous union contracts with such unions as the American Federation of Musicians, Screen Writers' Guild and Screen Actors' Guild. These agreements have the effect of severely restricting the ability of RKO to profitably sell such films for use on television. Also, individual pictures are restricted by contracts with the talent employed in such pictures. Of additional substantial importance is the fact that RKO might seriously impair

its distribution business if it released its films to the television industry.

Parenthetically, RKO's distribution business is its only successful side. The impairment of RKO's business would arise because the use of the films on television would adversely affect RKO's normal business and would hurt the reissue value of its film library. Certainly these factors were properly considered by the board in evaluating the film library from the point of view of its television possibilities. This is not to say that the directors decided that it had no such value. Rather, it is only to show that this asset is not the "pie-in-the-sky" one might casually conclude.

Thus the directors concluded that the film library was valuable, but they also felt that they were unable to place a flat dollar value on it. After considering the other factors, they were left with a leeway between the Hughes' offer and the other factors of about $8,800,000, and they conclude that such a figure would be sufficient to cover the reasonable present value of the film library for purposes of passing upon the fairness of the Hughes' offer.

Considering that plaintiffs have the burden and in the light of the factors just discussed, I cannot see from this record that plaintiffs have shown that the figure is grossly inadequate. Plaintiffs' suggested figure of $17,500,000 as the value for television purposes and $5,650,000 for reissue purposes is not supported by the record which confines me.

#### Plus Factor—Distribution Contracts—Good Will.

Plaintiffs say the directors gave no value to the good will factor arising from RKO's profitable distribution contracts. Plaintiffs do not give any particular value to this asset but merely say it has some value. Of course, RKO's good will value is sharply curtailed by its poor earning picture and, in a sense, the good will value is included in the aggregate value of the assets which go to make up the business. If the distribution end of the business alone was being sold, plaintiffs might appear to have a stronger case. But all the business (query as to the corporate name) is being sold. Moreover, the ability of the

present distribution business to operate alone profitably is quite doubtful.

Therefore, considering plaintiffs' failure to factually support their claim as to this item and in view of the other imponderables, I conclude that this item does not adversely affect the value conclusions reached by the directors.

### Plus Factor—Stockholders' Waste Actions.

The board of directors apparently considered on the basis of a recommendation of RKO's general counsel, that $2,000,000 would not be an unreasonable value to place on these waste actions against Hughes and other directors. While there are several actions pending, in a sense, they for the most part duplicate one another. Leaving aside the action which attempts to recover the profit made by Hughes on the syndicate deal, it appears that the other actions seek to recover losses to RKO under the Hughes' regime which occurred primarily in the production department which he supervised. While the evidence concerning the value of these actions was not fully developed at all, there is evidence from which it could be reasonably inferred that Hughes not only was unduly wasteful in operating the production end of RKO but because of his position was permitted to remain in control of production long after another person not so situated would probably have been removed. The rather consistent failure of the production department to meet release dates and to operate even near the picture budgets are strong evidence either of incompetency or indifference. It is noteworthy that other movie producers and distributors were making a profit during the same period.

Against this, RKO's evidence showed that their attorney analyzed at length the various law suits and, as indicated, suggested a consideration of the $2,000,000 figure for purposes of evaluating the fairness of the Hughes' offer. Moreover, it appears that large losses sought to be charged against Hughes for allegedly hiring high price talent and not using it, probably would not stand up in the light of the defense.

Also the movie industry and its standards are such that it is not unreasonable to assume that the court considering these waste actions

would not hold Hughes and the other directors to as high a business judgment standard—or perhaps I should say, the same standard of business judgment as one might apply in the work-a-day free enterprise world. After all, much of the success of the movie industry is dependent upon the whims of a fickle public. For a court to be unduly critical in second guessing those who try to anticipate the public desires would be both unfair and unduly restricting to the personnel of an industry which has often succeeded only by the application of unorthodox business methods.

I conclude that plaintiffs have failed to sustain their burden of showing that in considering the Hughes' offer, $2,000,000 was such an inadequate sum to attribute to the stockholders' actions as to constitute constructive fraud. *Karasick v. Pacific Eastern Corporation,* 21 *Del.Ch.* 81, 180 *A.* 604.

In summary, I cannot find that plaintiffs have demonstrated that any of the so-called plus factors should be adjusted as plaintiffs claim.

Minus Factor—$4,000,000 Inventory Markdown.

The directors revalued inventory downward by $4,000,000 for purposes of considering the fairness of the Hughes' offer. Plaintiffs contend that this item was actually not considered by the directors and came about after the filing of the complaint in this court in order to make the figures match. I am inclined to feel that the item, if not the specific amount, was considered by the directors. It consists of certain completed but unreleased productions, certain productions in progress and charges to future productions as well as certain story rights and continuities, less amounts written off. The inventory figure on these items as of the October 3 balance sheet aggregated $11,998,000. They include such productions as "She Couldn't Say No", "Son of Sinbad", "French Line", "Dangerous Mission", "Jet Pilot" and "Susan Slept Here".

The directors determined that these assets were overvalued by $4,000,000 of which $1,500,000 was generally attributed to "Jet Pilot". Specific amounts were not allocated to the others. The directors, of course, were generally familiar with these assets and

the market therefor. The consideration of the propriety of deducting this amount from these items is most difficult at best because it is a business judgment based on a high class guess in a speculative field.

Plaintiffs rely on certain fragmentary evidence in the form of statements by some of the RKO officials that "Jet Pilot" would set box office records; "French Line" would gross $4,000,000 and it is breaking records. Plaintiffs point out that only Hughes, who did not testify, has seen "Jet Pilot".

Against plaintiffs' evidence we find testimony that production schedules were not met and costs often greatly exceeded the budget fixed for them. Thus "Jet Pilot" was budgeted for $2,000,000 and actually cost $3,500,000. Also, new fads in movie exhibition and other considerations adversely affecting the industry were all considered by the directors in arriving at the $4,000,000 markdown.

Based on the evidence before me, I cannot say that the $4,000,000 markdown was unwarranted even though it appears that some of it was caused by the unprofitable operation of the production end of this business under Hughes' supervision. This is a case where plaintiffs have the burden and have failed to sustain it on the record before me.

### Minus Factor—Anti-Trust Claims.

The directors considered a possible liability for anti-trust claims in the near future of from $7,000,000 to $11,000,000. The board adopted the $7,000,000 figure and offset it by an existing $1,000,000 reserve which appeared on the books. In other words, they deducted $6,000,000 for this factor for purposes of considering the fairness of the Hughes' offer. The board in so evaluating these actions had the benefit of an elaborate review thereof from their own anti-trust attorney.

The facts presented to the board show that one or more of the RKO companies are defendants in over 200 anti-trust cases seeking injunctions and damages of $446,000,000. During the past year alone 63 such cases have been filed seeking over $200,000,000. In the past three years about $900,000 has been paid to outside persons in the

settlement and dispositions of some of the minor cases. However, it appears that these expenses were absorbed in profit and loss.

Plaintiffs do not suggest that Hughes is responsible for these anti-trust actions against RKO. The question, once again, is whether plaintiffs have shown a gross disparity between the $7,000,000 and what I shall call the actual potential liability of RKO for this item. The court is in the unenviable position of having an inadequate showing of an admittedly complicated and highly speculative value factor. While plaintiffs may fairly say that the shortness of time before the trial was responsible, nevertheless, plaintiffs insisted upon the trial date and waived the examination of certain witnesses. Therefore, as between the parties, plaintiffs have the burden and plaintiffs must suffer the consequences.

Plaintiffs say RKO failed to call as trial witnesses certain of the directors who were present in the courtroom and so an adverse inference should be drawn. It is true that these men were present but they were examined before trial by plaintiffs and portions of their depositions were introduced at the trial. Plaintiffs could have called them had they desired. I conclude that no adverse inference is warranted under the circumstances. The same is true as to the failure of RKO to produce the company's anti-trust attorney. RKO's counsel represented to the court that he took sick in Wilmington during the trial and that his illness was the reason why he did not testify. I find nothing in the record to refute his statement. Moreover plaintiffs did not ask to have his testimony taken.

Although I entertain some doubt in the matter, I am just unable, on this record and in view of plaintiffs' burden, to say that the $7,000,000 figure constituted a gross over-evaluation of this minus item for purposes of considering the Hughes' offer.

Plaintiffs' brief contains a so-called summary. In this summary, plaintiffs arrive at a figure of $40,021,722 as the net value of the assets. When these figures are analyzed, it appears that the only substantial differences between the values placed on the various plus and minus factors by plaintiffs and by RKO concern themselves with the value of the film library and the anti-trust liability. Plaintiffs say the

value of the film library for reissue and television purposes comes to $23,150,000. Van Wagner, RKO's comptroller, testified that he felt that a figure of from $5,000,000 to $7,000,000 for the whole film library for all purposes would be reasonable in connection with the consideration of the Hughes' offer. It will be recalled that the directors felt the $8,800,000 would accommodate the fair value of the film library. Since I have already concluded that the plaintiffs have not sustained their burden with respect to the value of the film library, it may be seen that by replacing plaintiffs' figure for this item with RKO's figure, we arrive at a final value figure somewhat less than the amount of Hughes' offer.

As an alternative argument plaintiffs take the aggregate of all the other items concerning which it charges error, amounting to $11,700,000, and ask the court to conclude that even accepting RKO's film library value figure, nevertheless, the value of the assets is some $11,000,000 greater than the Hughes' offer. It is apparent that the difficulty with accepting plaintiffs' argument is that the items which go to make up the $11,000,000 figure have been rejected item by item in the foregoing discussion. Cumulative consideration does not alter my conclusion.

It follows that plaintiffs have failed on this record to sustain their burden of showing the requisite gross disparity between the Hughes' offering price and the fair value of the assets.

### Alleged False Proxy Statement.

But plaintiffs say that the proxy statement is false and fraudulent and in consequence the stockholders' vote should be ignored as fraudulently induced.

Under my assumption here, we are dealing with a legally interested board of directors. RKO must show, under my assumption, that the proxy statement adequately informed the stockholders concerning matters pertinent to the offer. Otherwise, the stockholder vote, particularly where it has the effect of shifting the burden, would be meaningless. Let us consider the respects in which plaintiffs claim that the proxy statement was fraudulently misleading.

The proxy statement says that the board thoroughly considered the facts relating to the value of the assets of the corporation and its subsidiaries. Plaintiffs say this is a definite misrepresentation because the board did not thoroughly consider the value of the real estate. Plaintiffs point out that there was no appraisal and no real estate expert was present. I have already discussed the peculiar nature of the value of RKO's real estate and I think it fair to conclude that the directors were reasonably conversant with its value. Viewing the record in its entirety, I find no misrepresentation on this score. Compare *Mitchell v. Highland-Western Glass Co.,* 19 *Del.Ch.* 326, 167 *A.* 831.

Plaintiffs next say that there was scant discussion by the directors of the film library and little, if any, consideration given to it. I see no merit to this objection. After all, who is to say, within limits, how much consideration constitutes thorough consideration, especially when the parties are already familiar with the problem.

Plaintiffs say the directors did not thoroughly consider the value of the waste actions. The directors received a long report from RKO's general counsel on these actions and with due regard for the fact that the directors are non-lawyers, I do not see how the court could say that they did not thoroughly consider the value of this asset. After all, seasoned attorneys would undoubtedly differ widely in their evaluation of these actions, putting aside any question of partisan advocacy.

Plaintiffs discuss at length the various preliminary drafts of the proxy statement in an effort to show fraudulent misrepresentations to the stockholders. Basically, they seek to show that certain changes made in the drafts indicate that the directors did not in fact consider some elements of value at the Atlanta meeting, even though the final proxy statement said that they did. Plaintiffs say the final statement was "doctored" to make up the value deficiencies pointed out for the first time in the complaint in this action. It is difficult to evaluate the importance of the draft changes especially when some were required by the S. E. C. and some were apparently first made by counsel. Certain matters contained in drafts only have value as some evidence that the value factors were not in fact considered by the

directors. They cannot be said to constitute of themselves fraudulent misrepresentations to the stockholders because they were never sent to the stockholders.

As stated, plaintiffs say the corrections in the drafts show that certain items were inserted after attention was called to them by the filing of the present complaint. Assuming that the complaint did constitute the reason for the insertion in the final proxy statement of the items dealing with write-offs and anti-trust liability, nevertheless, I am not persuaded that such items were not considered at the directors' meeting in Atlanta. It may be noted that the proxy statement finally issued specifically refers to this lawsuit.

Plaintiffs say that the proxy statement is fraudulent for failure to state the dollar value placed on the waste actions against Hughes, et al. As I understand it, the directors really did not evaluate the waste actions at $2,000,000. What they did was, on the advice of RKO's counsel, to accept a $2,000,000 figure as a reasonable settlement figure in connection with a consideration of the fairness of the Hughes' offer. I do not find this improper. Compare *Karasick v. Pacific Eastern Corp.*, above.

Of course, the value of such actions is a guess at best and while RKO perhaps had reasons why it did not desire to disclose the limited purpose $2,000,000 figure, it would have been desirable in my opinion to do so. But I cannot conclude that the failure to put the figure into the proxy statement constitutes a fraudulent misrepresentation in view of the elaborate presentation of the nature of the actions in the proxy statement. It is apparent from the proxy statement as a whole what relative value range was accorded these actions and the film library.

The proxy statement says that the management is "unable to place a definite value upon the film library". Once again, plaintiffs say that some figure should have been given and I am inclined to agree, at least a range. But the omission or inclusion of this item is within an area of management judgment, particularly, in view of the circumstances. I do not see how the failure to mention a specific

figure or range can be said to constitute fraud under the circumstances. Compare *Kaufman v. Schoenberg,* 33 *Del.Ch.* 211, 91 *A.2d* 786.

It is true that the proxy statement makes no mention of "The Robe" and the value of $519,000 conceded to be receivable by RKO. No attempt is made by RKO to deny that this is an asset in the amount mentioned and is to be considered in determining the fairness of the offer. RKO's counsel points out that the proxy statement said that in the opinion of management, on March 31, the book value would be less than $4.00 per share. When the receipts from "The Robe" are included, this statement is still true. Thus, I cannot find that the failure specifically to mention this item warrants any inference of fraud. At best, once again, specific reference or not was within the range of reasonable management discretion. *Kaufman v. Shoenberg,* above. It was considered by the directors.

Other misrepresentations are alleged by plaintiffs but time and space do not permit individual reference to them in this already inordinately long opinion. I have considered them and I conclude that none of them justifies a finding of fraudulent representation, assumption, or omission, in the proxy statement. While S. E. C. clearance does not constitute approval of the proxy statement, it was received here and is some evidence that it was policed at least to prevent glaring weaknesses either by way of inclusion or omission.

In a matter so complicated and all embracing and in an industry where orthodoxy seems to be the exception rather than the rule, it is practically impossible for a proxy statement to do full justice to the informational needs of one desirous of doing an intelligent evaluation job. The effort made was sufficient in my judgment, on this record, to withstand a charge of fraudulent misrepresentation in the matter finally submitted to the stockholders.

### Bad Faith.

Finally, plaintiffs charge that the proposed sale of assets is tainted with bad faith. Plaintiffs claim of fraud or bad faith is at best an invitation to reconsider as a whole the various individual charges just reviewed. Conceding that Hughes, by his offer, will by-pass the

impending derivative waste actions against him, that consequence does not condemn the transaction. It is not uncommon for corporate executives to attempt to clean the litigation slate in one fell swoop in order to be done with it.

This court recognizes that the $6 cash redemption feature of the Hughes' offer was calculated to influence some stockholders to vote for approval who, otherwise, might have been less enthusiastic. I have considered this fact and the fact that Hughes was in control of the branch of RKO which produced these large losses. In fact, RKO is apparently now losing about $100,000 per week. Had the burden rested on RKO to justify the fairness of the sale a more serious situation would have confronted the court. But, because of the stockholder approval the law shifts the burden to plaintiffs and I must conclude that on this record they have failed to sustain the substantial burden of showing such a gross disparity as would warrant the finding of constructive fraud.

I therefore conclude that plaintiffs have failed to sustain their burden of showing fraud or bad faith. It follows that they are not entitled to an injunction restraining the effectuation of the Hughes' offer.

Plaintiffs also sought a receiver for RKO. They have not pressed this prayer and I assume that it was abandoned.

A judgment on the merits in favor of the defendant RKO will therefore be entered.

Order on notice.