139 A.2d 591 (1958)
Kingsley H. GERLACH, Kingsley H. Gerlach, Jr., and Reeves Lewenthal, Plaintiffs,
v.
Grant GILLAM, Wrightson Christopher and United Printers & Publishers (Incorporated), a Delaware corporation, Defendants.
Court of Chancery of Delaware, New Castle.
March 18, 1958.
Arthur G. Logan, Wilmington and Ernest A. Gross of Curtis, Mallet-Prevost, Colt & Mosle, New York City, for plaintiffs.
Aaron Finger, Wilmington, Carlos A. Spiess and Roger W. Barrett of Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., for defendant, United Printers & Publishers, Inc.
MARVEL, Vice Chancellor.
Plaintiffs, who claim to be the holders of a substantial number of shares of the defendant corporation, an established manufacturer of calendars, greeting cards and the like, sue on behalf of themselves and all other stockholders of United similarly situated, and "* * * in the right of United". The original complaint charges the defendant, Gillam, with having so dominated the corporate defendant through an unusual management contract that over a period of some twenty years he has been able to select *592 the directors of the corporation and otherwise control its management to such a degree that in the autumn of 1957 he caused such a board to approve contracts between the corporation and himself and others as stockholders of three Canadian corporations, which contracts are allegedly not in United's best interests. These Canadian corporations, which are not parties to this action, bear the names, Rust Craft Ltd., Friendship House Ltd., and Volland Ltd.
The original complaint sought an accounting from the defendants, Gillam and Christopher, concerning United's past business transactions with the Canadian corporations, and also claimed that Gillam's control of United having been seriously threatened last summer by the efforts of plaintiffs and other stockholders to call a special meeting and vote in additional directors independent of Gillam, he reacted by rapidly developing a plan to sell stock of the Canadian corporations to United in a transaction which would, if consummated, result in Gillam and his associates receiving 150,322 shares of United stock in exchange for their Canadian stock, thereby giving them control of the corporation as a practical matter. As of now, Mr. Gillam is allegedly not a stockholder of United.
Injunctive relief was sought not only against consummation of such purchase and sale, which had been approved by the directors other than Gillam subject to stockholders ratification, but also the continued performance of certain so-called color separation supply contracts now in force between United and the Canadian corporations. Under these contracts United supplies positives of card designs to the Canadian corporations, thereby eliminating for them a substantial and costly step in card production. The original complaint charged that incomplete and even misleading information had been sent to stockholders by the Gillam dominated management for a number of years, and in an amended and supplemental complaint it was specifically alleged that management had solicited votes and proxies for a special stockholders' meeting convened on November 19, 1957 for the purpose of passing on the plan to purchase stock in the Canadian corporations "* * * by false and misleading statements and by statements lacking the candor requisite to obtain a valid proxy * * *" In the amended and supplemental complaint, plaintiffs prayed that the Court declare that despite a numerically favorable vote such proposal had not been legally ratified at such meeting because of such statements.
Prior to the meeting and on the basis of the original complaint and supporting affidavits, plaintiffs had moved to enjoin the special stockholders' meeting, and on November 15, this Court, while declining to enjoin the holding of such meeting, entered an order which restrained United "* * * from putting into effect the three agreements relating to the proposed acquisition by United of the outstanding shares of the three Canadian companies * * *" This order, while technically a preliminary injunction issued on a ten days rule to show cause has been treated by counsel as a restraining order, and this is the decision of the Court as to whether or not such order should be dissolved and the corporation permitted to consummate the transaction complained of prior to trial.
Following the November 19 meeting, management filed a certificate to the effect that at the meeting at which 520,200 shares of common stock were entitled to vote, 246,609 shares voted for adoption of a resolution ratifying the agreements for the purchase of stock of the Canadian corporations in exchange for 150,322 shares of United common stock, and 204,670 shares against such purchase. On the basis of such vote management asks to be permitted to carry out the contemplated exchange of stock free of interference by this Court.
The corporation's basic contention in support of its motion for the lifting of the present injunction is that regardless of the wisdom of the contracts under attack, they have been ratified by the stockholders *593 after approval by allegedly non-interested directors at a meeting which Mr. Gillam did not attend and that as an elementary matter of corporate democracy there is no conceivable basis to support plaintiffs' claim for injunctive relief. It is contended and cannot be denied that where a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified transaction normally must fail. Counsel for the corporation further point to the long drawn out battle for control of the corporation which began last summer (a contest in which plaintiffs actively participated), the use of proxy material by plaintiffs and their associates since that date, and charge that plaintiffs' present contention that defendant's proxy material for the November 19 meeting was false and misleading, is simply an exhibition of poor sportsmanship.
The situation presented by the papers before me is the reverse of the one found in the ordinary case involving the purchase and sale of corporate assets. A sale of assets case often involves a charge of conflict of interest on the part of a corporate fiduciary who is at the same time the direct or indirect would-be purchaser of his corporation's assets. Here, on the other hand, a corporation has agreed in exchange for its own shares to purchase shares of stock largely owned by the fiduciary, so that the Delaware statute and cases which control in the field of presumptions and burdens of proof when a sale of corporate assets is attacked are not strictly in point but do provide a guide. See 58 Columbia Law Review, 251 at 256 et seq.
First of all in the present situation I have no doubt concerning Mr. Gillam's obligation to exhibit complete candor in dealings involving a conflict between his personal interests and those of United's stockholders. Under a unique arrangement originating in 1932, first through General Management Corporation and later through a partnership known as General Management Company, Mr. Gillam for a fee to be paid originally to his corporation and then to his partnership was given broad managerial powers over the affairs of United, which at the inception of the arrangement was in serious financial straits.
The 1937 version of this continuing and essentially unchanged contract between United and General Management Company, of which Mr. Gillam was the controling partner, provided in part:
"The Company will have general supervision over the Corporation's operations to the extent that the Corporation agrees to give the Company full cooperation and to follow recommendations made by the Company promptly and to give them a fair trial. Grant Gillam, as Comptroller, shall continue to supervise the fiscal operations of the Corporation, its divisions and its subsidiaries, and no monies shall be borrowed by the Corporation, its divisions and its subsidiaries, and no payments shall be made to any of the Creditors of the Corporation, its divisions and its subsidiaries without the approval of such Comptroller. The countersignature of such Comptroller or some person or persons designated by him, shall be required on all checks, notes or obligations for the payment of money made or issued by the Corporation, its divisions or any of its subsidiaries. The Corporation, however, reserves the right to pay its entire bank indebtedness at any time."
Mr. Gillam, upon becoming comptroller, managed United's affairs with a strong hand even to the extent of pre-preparing minutes of directors' meeting in his capacity as secretary of the corporation, a position he has held during most of the period of question, and notwithstanding the sworn protests of individual directors that they have not been at any time dominated by Mr. Gillam, I am satisfied that the management contract, which by its *594 very nature carries the reserved right in the comptroller to terminate his employment upon failure of the board to go along with his suggestions, has given Mr. Gillam until recently a very strong position not only in his relations with the directors but also with the stockholders. While there appear to have been differences of opinion at times between United's other directors and Mr. Gillam, such as the one involving the site for a new plant in 1950, Mr. Christopher, then a director and now president of the corporation, felt obliged to consult Mr. Gillam on the matter, though Gillam was not then on the board of directors. Thus the overall picture presented on the present record is that of strong personal and contractual leadership exercised by Mr. Gillam in all fundamental matters affecting United's interests over the past twenty-five years and a tendency on the part of other directors not to look too closely into Mr. Gillam's plans. In view of these relationships any transaction involving a conflict between the interests of the corporation and those of Mr. Gillam would be at the least voidable unless ratified by informed stockholders.
Reverting to the transaction under attack, it appears that prior to approval by United's directors of the proposed acquisition of stock in the Canadian corporations a report of Duff, Anderson & Clark, industrial investment and financial analysists, was prepared for the directors' consideration. The report, which was favorable in a subdued manner, concluded that the acquisition of the three Canadian companies would result in (a) a small reduction in the book value of United's common stock and (b) a modest improvement in United's earnings per share resulting from the contribution of Canadian earnings. The report earlier noted among advantages to be gained by the Canadian stockholders would be the obtaining by them of a readily marketable security, namely United common, in exchange for their Canadian shares, but made no effort to dig into the value of United common stock and appears to treat the transaction as if it were a merger and not a purchase and sale of corporate shares. More significantly the report, while disclosing Mr. Gillam's stock interests, does not point up the consequences of his dominant position in the Canadian Companies, does not attempt to analyse or evaluate the existing supply contracts between United and the Canadian corporations, or to emphasize the solidifying of management control which would result from consummation of the transaction.
Turning to the proxy statement, the critical information in such statement in my opinion must of necessity be that concerning the supply contracts. They were the lifeblood of the Canadian corporations. I do not deem it appropriate at this time to go into the history of these contracts and the origin of the rates therein fixed as these are matters to be more appropriately sifted out in the accounting phase of this case. Suffice it to say that the section of United's proxy statement of October 18, 1957 entitled "Organization and Early History of the Canadian Companies" fails to disclose the dates of the Canadian supply contracts or to describe how they were negotiated and whether or not Mr. Gillam took part in their negotiation. The giving of the essentials of these transactions to the stockholders could not but have helped to clarify how prices for the color separation positives and other services dealt with in said contracts were arrived at and adjusted and point up Mr. Gillam's apparently ambiguous position on both sides of the bargain. In short the proxy statement compounds the shortcomings of the Duff, Anderson & Clark report by failing to give the stockholders this essential information, thereby making it impossible for them to make an objective evaluation of the proposed transaction. In addition, candor as to other factors in the transaction is also absent in the proxy statement, such as the failure to give a logical reason for United's disposal *595 of its Canadian interests to Gillam in 1946 at a time when such business was prospering and why foreign rights were granted by United to the Canadian corporations in which Gillam had such a substantial personal investment.
Were this a case simply of excessive zeal on the part of a management seeking to present proposed corporate action to stockholders in the light most favorable to management even though such plan of action contain benefits for individual directors, this Court should not at this stage be overly concerned with matters which might more properly have been included in the proxy statement, unless fraud is clearly apparent, Schiff v. RKO Pictures Corp., Del.Ch., 104 A.2d 267, and Empire Southern Gas Co. v. Gray, 29 Del.Ch. 95, 46 A.2d 741, and it can hardly be denied that plaintiffs and their associates made every effort to thwart management's plan.
Consummation of the transaction here under attack, however, will mean a drastically strengthened management position insofar as stock ownership is concerned. Without considering the question of preemptive right, a point not argued, but see Yasik v. Wachtel, 25 Del.Ch. 247, 17 A.2d 309, I am satisfied on the present record that plaintiffs should be protected from a strengthening of management's present position. Furthermore, while present consummation of the transaction complained of would not make plaintiffs' case moot as in Allied Chemical & Dye Corporation v. Steel & Tube Co., 14 Del.Ch. 1, 120 A. 486, yet, if at final hearing the Court should find that stockholders were not sufficiently informed effectively to ratify the transaction complained of or that the transaction is otherwise fraudulent as constituting pro tanto a gift of assets, the United stock bargained for by the holders of the Canadian stock should be available for cancellation. Mr. Gillam and Mr. Christopher have not appeared and the other Canadian stockholders are not parties.
In acting upon an application for interlocutory injunctive relief, a court of equity is bound to balance the conveniences of the opposing parties. As stated in Bayard v. Martin, Del., 101 A.2d 329, 333.
"The probability of ultimate success, being of obvious practical importance, is one of the elements which must always be weighed in the balance, along with the probability of any harm to be suffered by one party or the other on account of giving the requested temporary relief, or withholding it, as the case may be."
There being no showing on the present record of urgent need for changing present business arrangements between the corporation and the Canadian corporations, the equities are on plaintiffs' side. No other way of maintaining the status quo than through a continuation of the present injunction has been suggested, and such injunction will not be dissolved.
On notice, an order to such effect will be entered.