184 A.2d 173 (1962)
Aida ABELOW, Irving Abelow, Herbert B. Abelow, Bradley I. Abelow, Carl S. Jossem, Margo Rose Jossem, Stephen B. Jossem, Everett Wendler, Theodora H. Wendler, Bradley Sheridan, Catherine A. Sheridan, Cornelius B. Sheridan, Christopher Sheridan, Mitchell & Company, Helen G. Hamburg, Mildred K. Rosen, Henry Sakolsky, Herman Goodfriend, Irwin Guttag, Sol Stuttman and Jack Jossem, Plaintiffs,
v.
Garner SYMONDS, R. C. Graham, J. E. Ivins, N. W. Freeman, Chas. A. Lingo, R. K. Hanger, Ardon B. Judd, Eugene M. McElvaney, Roy S. Nelson, A. D. Simpson, Jackson D. Breaks, Philip C. Dixon, Eugene Geddes, James G. Glass, C. Jeff Jennings, G. B. Leighton, Sydney R. Newman, William J. Price, III, Earl D. Wallace, W. H. Blackburn, A. B. Weeks, and Midstates Oil Corporation, a Delaware Corporation, Middle States Petroleum Corporation, a Delaware Corporation, Tennessee Gas Transmission Company, a Delaware Corporation, Defendants.
Court of Chancery of Delaware, New Castle.
September 21, 1962.
*174 Daniel O. Hastings, Clarence W. Taylor and Russell J. Willard, Jr., Hastings, Lynch & Taylor, Wilmington, for plaintiffs.
Henry M. Canby and Richard J. Abrams, Richards, Layton & Finger, Wilmington, for corporate defendants.
MARVEL, Vice Chancellor.
The question here in issue is the legal adequacy of the price paid to the selling corporation for all of its property and assets in a transaction in which not only both the buying and selling corporations were controlled by the defendant Tennessee Gas Transmission Company but where almost 96% of the stock of the seller was held by the purchasing corporation. The basic facts about the transaction under attack have been set forth in two earlier opinions in this case (Del.Ch., 156 A.2d 416 and Del. Ch. 173 A.2d 167) and will not be repeated here. Suffice it to say that plaintiffs, who prior to the filing of this litigation were minority stockholders of Midstates Oil Corporation, the selling corporation, seek money judgments for themselves and members of their class on the theory that as a result of breaches of fiduciary duty on the part of interested directors and stockholders of the defendant corporations, plaintiffs and other minority stockholders of Midstates were grossly underpaid for their stock on liquidation of their corporation. Such liquidation took place following purchase of the assets of Midstates by its parent corporation, Middle States, for what plaintiffs claim was a grossly inadequate consideration.
First of all there is no doubt but that Tennessee Gas Transmission Company, which some five months before the sale under attack had acquired control of Middle States through an exchange of stock, had decided in the early part of 1958 to make every effort to integrate the assets of Midstates into its system and meanwhile to take every reasonable precaution to prevent them from falling into the hands of an outside purchaser. The response to an offer to exchange stock made to the stockholders of Middle States insured the ultimate success of Tennessee's plan inasmuch as some 98% of the assets of Middle States consisted of its stock in Midstates. However, the question for decision is not whether Tennessee could have arranged for the ultimate acquisition or disposition of the assets of Midstates in a manner more in plaintiffs' interests but rather whether Tennessee, in protecting the interests of its own stockholders and in carrying out its own plans for integration of the Middle States system into its own, caused compensable injury to plaintiffs and those of their class. In short, plaintiffs, in my opinion, had no absolute right to have the same offer made to them as was made to the stockholders of Middle States.
The sale in question having been directly attacked and defended on cross-motions for summary judgment, such motions after briefing and argument were denied. Thereafter *175 the issue of the fairness of the price paid for the assets of Midstates was tried, and this is the opinion of the Court after trial.
Section 271 of Title 8 Del.C. provides as follows:
"Every corporation organized under the provisions of this chapter, may at any meeting of its board of directors, sell, lease or exchange all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions and for such consideration, which may be in whole or in part shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors deems expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of the holders of a majority of the stock issued and outstanding having voting power given at a stockholders' meeting duly called for that purpose, or when authorized by the written consent of the holders of a majority of the voting stock issued and outstanding. The certificate of incorporation may require the vote or written consent of the holders of a larger proportion of the stock issued and outstanding."
While plaintiffs at trial were allowed to introduce into evidence documents which clearly indicated that in the early part of 1958 serious consideration had been given by the then boards of both Midstates and Middle States to a disposal of the assets of Midstates to outside interests, nonetheless, plaintiffs by merely demonstrating that another method of disposing of the assets of Midstates might have been employed which would have possibly carried greater pecuniary benefits for them, have not, in by opinion, succeeded in establishing their claims for money judgments in the form of additional compensation for their surrendered shares. In other words, plaintiffs, notwithstanding the incidence in their favor of the burden of proof as a result of Tennessee's intrusion into the Middle States' system, have failed to establish that an obvious and deliberate freeze out was perpetrated by interested directors and stockholders for the very purpose of preventing plaintiffs from receiving a full and adequate price for their surrendered shares from those responsible for the transaction complained of.
I have reached such a conclusion notwithstanding the fact that, as noted above, the burden of proof in this case rests on the responsible defendants as it must when the seller is dominated by the purchaser and independent stockholder ratification cannot be given. In discussing such a situation in Schiff v. RKO Pictures Corporation, 34 Del. Ch. 329, 104 A.2d 267, Chancellor Seitz stated as follows:
"For purpose of considering the Gottlieb [v. Heyden Chemical Corp., 33 Del.Ch. 177, 91 A.2d 57] principle, I shall assume that where it appears that the purchaser in fact dominates and controls the board of the selling corporation then those espousing the transaction would have the burden of showing its fairness, absent independent stockholder approval. It is true that the Gottlieb case involved a stock option and that the Delaware statute authorizing options does not explicitly call for both director and stockholder approval, as does the sale of assets statute. However the stock option plan in the Gottlieb case required both and so the principles announced by the court would seem equally applicable."
Therefore, in judging the legality of the transaction here under attack the Court is not assisted by the doctrine of stockholder ratification, it appearing in the case at bar that over 95% of the stock voted in favor of the sale was owned by the buyer. To apply the theory of ratification advanced by defendants, namely, that a majority of the independent stock which voted on the sale did in fact favor it, would, under the facts of this case, emasculate the principle *176 of stockholder approval, such interest making up only 1.362% of the outstanding stock of Midstates. Accordingly, the Court has "* * * no choice but to employ its own judgment in deciding the perhaps very close and troublesome questions as to whether the evidence shows that the directors in fact used the utmost good faith and the most scrupulous fairness". Schiff v. RKO supra.
Plaintiffs' contentions concerning the benefits they might have received had the Midstates assets been sold to a third party, or, more to the point, had plaintiffs had the opportunity to exchange their stock for Tennessee stock, though not lacking in appeal, overlook the fact that the Delaware Corporation Law permits the very type of transaction about which they complain. It must be sustained unless it has been proven to be legally unfair under the test imposed in the Gottlieb case. The mere fact that plaintiffs might have received greater financial benefits as a result of another type of transaction begs the question. In other words, contentions as to what other steps might have been taken to bring about a termination of plaintiffs' status as stockholders of Midstates either by means of an outside sale, an exchange of shares, or through a merger, merely skirt the periphery of the question here presented, namely, did the sale under attack fully meet the requirements of the Delaware law governing sales of corporate assets? That plaintiffs as directors might well have employed a different corporate device to accomplish the final liquidation of their corporation and thereby have benefited themselves and those of their class financially does not mean that the action actually taken by interested directors and stockholders was violative of Delaware law. The Delaware Corporation Law offers a number of avenues for the accomplishment of corporate action, Hariton v. Arco Electronics, Inc. (Del.Ch.) 182 A.2d 22.
The seeds of plaintiffs' grievances are found in the fact that in February, 1958 the services of Dillon, Read & Co., Inc., were engaged by the then directors of Middle States to explore with selected companies the possibilities of selling all or substantially all of the assets of Midstates at a price satisfactory to Middle States. However, representatives of Dillon, Read were not examined by deposition or in open court, thus their exploratory efforts were not exposed to cross examination. The sale of these assets had been foreshadowed for some time, Midstates having been for some time in the unenviable position of a producer without refining or marketing facilities as well as being burdened with debt which its declining income had been unable to reduce. The upshot of such arrangement was the submission by Dillon, Read of five briefly summarized proposals, including that of Tennessee Gas for a proposed tax free exchange of its stock for that held by the stockholders of Middle States. This proposal and that of Pan American Oil Co. for a taxable purchase of the assets of Midstates were singled out by Dillon, Read, as "acceptable". Its letter of May 6, 1958 goes on to state: "Because of the closeness in estimated dollar value as between the two offers, it is our recommendation that you determine which offer you desire to accept on the basis of your own evaluation of the relative advantages and disadvantages to your stockholders resulting from the considerations * * *" outlined earlier in the letter.
What thereafter transpired led to this long and bitter suit. As noted in the earlier chapters of this case, the stockholders of Middle States as a result of the implementation of the exchange proposal of Tennessee Gas were given the opportunity to exchange their shares for that of Tennessee on the basis of 45 shares of Tennessee for each 100 shares of Middle States stock, a formula based apparently more on a resolve to preserve a continuation of Tennessee's normal dividend than on an exact appraisal of stock values. In any event, no effort was made to equate the exchange ratio with a cash purchase of assets and the *177 fact that an exchange was imminent had no doubt affected the market price of Middle States stock which rose several dollars during the three months immediately preceding the exchange.
As a result of this offer 2,332,907 shares of Middle States (95.3% of its outstanding shares) were exchanged for 1,049,809 shares of Tennessee stock. This offer was not extended to the stockholders of Midstates, and as a result they claim to have improperly been offered substantially less in cash on the ultimate liquidation of their corporation than the cash value of the equity they would have acquired in the Tennessee system had they been included in the exchange proposal. But, as has been stated several times in this litigation, the volatile values of corporate stock may not in the type of transaction here involved be rigidly equated with aliquot shares in a postulated corporate liquidation. There being no showing of fraud in the case, plaintiffs have cause to complain only if after close scrutiny of the terms of the sale as actually consummated, it is determined by the Court that plaintiffs and members of their class did not receive a legally sufficient price for their stock.
The actual dollar figure placed on the assets of Midstates by the appraisal reports relied on by defendants was $30,120,172. From this figure it is necessary to subtract $5,200,000 in liabilities. The resulting net worth accorded to the assets in the transaction was accordingly $24,920,172 or a dollar figure per share of $1,123.76. Plaintiffs claim that they should have received up to $330 more per share. However, plaintiffs, in my opinion, have failed to prove that they are in fact entitled to such additional payments. As stated in the opinion in this case found in 173 A.2d 167:
"They (defendants) submit that the data introduced by them in affidavit form discloses that on December 9, 1958, the date of the actual contract governing the basic transaction under attack, the book value of plaintiffs' stock was $802 per share, that the going concern value per share was then $913 per share, the market value per share was $1,065.00 and the asset value per share based on the Harrison appraisal was $1,123.76."
When these uncontroverted evaluations of plaintiffs' stock are considered in the light of the comprehensive Harrison appraisal, I have no doubt but that plaintiffs and members of their class received legally sustainable value for their shares. Plaintiffs overlook the fact that once a decision had been made by the management of Tennessee to acquire control of the Middle States system, the only way to achieve such result was to avoid any overreaching of the rights of the minority stockholders of Midstates and at the same time guard the proper interests of Tennessee's own stockholders. The reputation of Robert W. Harrison as an appraiser of oil and gas properties is well recognized, and plaintiffs were not, in my opinion, successful at trial in breaking down his methods, reasoning, or the results of his work. In the face of such appraisal and its implications, plaintiffs failed to introduce any evidence which seriously impugned Mr. Harrison's competence or the accuracy and fairness of the appraisal itself. Furthermore, no effort was made to establish by competent evidence the details of the provisional Pan American proposal or to introduce the testimony of an opposing expert appraiser. The Court's views as to the force of the Harrison appraisal and its supporting data had been clearly disclosed to plaintiffs earlier in this litigation in its opinion on the parties' cross-motions for summary judgment found in 173 A.2d 167, wherein it is stated:
"Defendants contend that the price offered for the assets of Midstates, while based in part on a study of accounting data prepared by Arthur Anderson & Co., was basically derived from an independent survey made by Robert W. Harrison, a well-known and respected expert in appraising oil and gas properties. It is pointed out that *178 whereas in the case of most industrial operations the customary method of appraising assets emphasizes capitalization of earnings, in the petroleum industry valuation is customarily arrived at in large part by placing a dollar value on estimated reserves of oil and gas. According to his affidavit, Mr. Harrison made individual appraisals of Midstates' twenty four major fields, a project which allegedly required eighty five man days to complete, and accepted the Kravis figures as to scattered leasehold interests after adjusting them to September 30, 1958.
"After reducing the present appraised worth of future net income of the properties by twenty five to thirty per cent in order to arrive at the fair market value of the reserves in question, he fixed such value as of September 30, 1958 at $24,000,000. Inasmuch as no request had been made to appraise undeveloped leaseholds of Midstates, such properties were listed at book value, such being the ordinary method of evaluating underdeveloped leasehold and royalty interests. A salvage value was also given to well and lease equipment employed by Midstates in its business."
While arms' length bargaining between a willing buyer and seller is the time tested method of arriving at a fair selling price for corporate assets, an independent and honest appraisal is sometimes by necessity the only acceptable method of establishing fair value, Fidanque v. American Maracaibo Co., 33 Del.Ch. 262, 92 A.2d 311. Compare Sterling v. Mayflower Hotel Corp., 33 Del.Ch. 20, 89 A.2d 862, aff'd 33 Del.Ch. 293, 93 A.2d 107, 38 A.L.R.2d 425. Here, plaintiffs have failed effectively to discredit such an appraisal. Their contentions fall wide of the bad faith demonstrated in Lebold v. Inland Steel Co. (C.A. 7), 125 F.2d 369. In view of the conclusions herein reached it is unnecessary to consider the defense of estoppel and the contention that plaintiffs' action is in fact derivative.
On notice, an order may be submitted entering judgment for the corporate defendants.