W.B. Dixon STROUD, Jr., Morris W. Stroud, Agnes S. Peele, and Anne S. Bradford, Plaintiffs Below, Appellants,

v.

J. Peter GRACE, Dr. George C. Dacey, Dr. T.J. Malone, Roger Milliken, H.W. Jockers, Dr. H. Keith Brodie, Minot K. Milliken, F.G. Rogers, Rene C. McPherson, Gerrish H. Milliken, and Milliken & Company, a Delaware Corporation, Defendants Below, Appellees.

Supreme Court of Delaware.

Submitted: April 23, 1991.
Decided: April 9, 1992.

78 ■

William Prickett (argued), Michael Hanrahan and Ronald A. Brown, Jr. of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for plaintiffs below-appellants.

Andrew B. Kirkpatrick, Jr. (argued), and Andrew M. Johnston of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant below-appellee/cross-appellant Milliken & Company.

Clark W. Furlow and David A. Jenkins of Smith, Katzenstein & Furlow, Wilmington, for individual defendants below-appellees/cross-appellants.

Before HORSEY, MOORE and HOLLAND, JJ.

MOORE, Justice.

This appeal arises out of a series of disputes between Milliken Enterprises, Inc. ("Milliken"), a privately-held Delaware corporation, and certain shareholders, mostly members of the Stroud branch of the Milliken family (the "Strouds"). Plaintiffs brought individual and derivative claims against Milliken and its board of directors ("defendants"), alleging that the board breached its fiduciary duties by recommending certain charter amendments to its shareholders (the "Amendments"). The Strouds also contested the adequacy and accuracy of the disclosures the board made to the shareholders in the notice of meeting at which the proposed amendments were to be considered, and also challenged the validity of the amendments and a by-law ("By-law 3") which established the procedure for nominating candidates to Milliken's board of directors.

The Court of Chancery *sua sponte* granted summary judgment for the defendants on all of Stroud's claims but upheld Stroud's attack on By-law 3. *Stroud v. Grace*, Del.Ch., C.A. No. 10719, Hartnett, V.C., slip op., 1990 WL 176803 (Nov. 1, 1990) ("*Stroud II*"). The Vice Chancellor ruled that the board's actions would not be reviewed under the standards set forth in *Unocal Corp. v. Mesa Petroleum Co.*, Del. Supr., 493 A.2d 946 (1985) and found that the notice of the annual meeting was not inadequate or misleading. The trial court held that the board was under a duty to disclose more information in its notice than the requirements of 8 *Del.C.* §§ 222(a) & 242(b)(1). The Court of Chancery ruled that Milliken did not have to disclose any confidential information to shareholders who had not first executed a reasonable confidentiality agreement. Finally, the trial court assessed Stroud's challenge to the validity of the Amendments and By-law 3 under the "compelling justification" standard of *Blasius Industries, Inc. v. Atlas Corp.*, Del.Ch., 564 A.2d 651 (1988). The Vice Chancellor found that the Amendments were fair, but that By-law 3 was

unreasonable on its face because it potentially prevented the shareholders from nominating their candidates for the board of directors.

We agree that *Unocal* was inapplicable. The board was not under a threat to its control and its decision to recommend the Amendments to the shareholders was not defensive. We also agree that the notice of Milliken's 1989 meeting was not legally insufficient, but reach this conclusion by a different analysis. Under the unique circumstances of this case, the board had no duty to disclose more than that required by the General Corporation Law. We also find that in certain circumstances a board can condition the release of confidential data to a shareholder upon the execution of a confidentiality agreement.

We agree that the challenged Amendments were fair to Milliken's shareholders, but reject an analysis under the heightened *Blasius* standard. While we generally agree with the broad principles articulated in *Blasius,* we find that the Amendments and By-law 3 did not merit such close judicial scrutiny. The board did not act when its control was threatened, and an overwhelming majority of Milliken's fully-informed shareholders approved the Amendments. Finally, we reverse the trial court's invalidation of By-law 3. We reiterate that Delaware courts should exercise caution when invalidating corporate acts based upon hypothetical injuries and without giving due deference to established principles of Delaware law regarding corporate governance.

## I.

The basic facts are not in serious dispute. We only summarize them in view of our comprehensive examination of this controversy in *Stroud v. Milliken Enterprises, Inc.,* Del.Supr., 552 A.2d 476, 477–79 (1989) (*"Stroud I"*). Milliken is a privately-held Delaware corporation. It is one of the largest and most successful textile businesses in the world. Most of Milliken's 200 shareholders are direct descendants of its founder, Seth Milliken. The Milliken board has ten members. Four directors, Roger Milliken, Chief Executive Officer, Gerrish Milliken, a retired Vice President, Minot Milliken, Vice President, and Dr. Thomas Malone, President, are all members of the Milliken family or employees of the corporation. The remaining six directors are otherwise unaffiliated with the company. Roger, Gerrish, and Minot Milliken own or control, through various trusts, over 50% of Milliken's preferred and common shares.

The current controversy arose after the death in 1985 of Mrs. W.B. Dixon Stroud, Roger and Gerrish's sister. As a result of her death, certain Milliken shares were released from a trust under the control of Roger, Gerrish and Minot to the Strouds, who now own or control close to 17% of Milliken's shares.

Soon after Mrs. Stroud's death, Roger proposed that the Milliken shareholders enter into a General Option Agreement ("GOA"). The GOA gave the Milliken family and then Milliken itself, a right of first refusal to purchase any shares offered to unrelated persons. The GOA recited that it was intended to keep the company in private hands and to prevent the dissemination of confidential data. Almost 75% of Milliken's shareholders executed the GOA. Only the Strouds and a few others did not do so.

The Milliken board then proposed charter and by-law amendments which were recommended to the shareholders for their approval at the April 15, 1987 annual meeting. Milliken solicited proxies in connection with the proposed meeting. The Strouds sued in the Court of Chancery to enjoin the meeting. The Strouds complained, among other things, that the notice of the meeting and the proxy materials contained inadequate and misleading information. Stroud also challenged the proposed amendments claiming that they were intended to entrench the board.

The trial court entered a temporary restraining order that was not contested. *Stroud v. Milliken Enterprises, Inc.,* Del. Ch., C.A. No. 8969–NC, Hartnett, V.C. (Apr. 28, 1987). A few weeks later, the Milliken board reconvened, withdrew the challenged charter amendments and by-

laws, and replaced them with a series of new provisions. Significantly, the board proposed to circulate a new notice of meeting. This notice did not explain the reasons for the changes, and stated that the board would not solicit proxies.

Stroud filed an amended complaint again challenging the notice, by-laws and charter amendments. The defendants moved for summary judgment. The trial court granted the defendants' motion in part and denied it in part. *Stroud v. Milliken Enterprises, Inc.*, Del.Ch., 585 A.2d 1306 (1988). An appeal to this Court was dismissed. *See Stroud I*, 552 A.2d at 481–82.

The board subsequently withdrew the 1987 amendments and replaced them with the present "Amendments." The most controversial aspects of the Amendments are charter Article Eleventh (c) and By-law 3. Article Eleventh (c) established a new method of qualifying directors for membership on Milliken's board. By-law 3 established the procedure for nominating board candidates. By-law 3 required the shareholders to submit a notice of their candidates to the board, specifying their qualifications under Article Eleventh (c), well in advance of the annual meeting. By-law 3 also empowered the board to disqualify a shareholder's nominee at any time even at the annual meeting.

The board considered the Amendments during meetings held on February 2, 1989, March 10, 1989 and March 11, 1989. The directors adopted the Amendments at their March 11, 1989 meeting which was attended by Milliken's counsel, nine of its ten directors, including five out of the six unaffiliated or outside directors. The board unanimously approved the Amendments and adopted a resolution recommending them to the shareholders for their adoption at Milliken's annual meeting scheduled for April 24, 1989.

On March 14, 1989, Milliken mailed notice of the 1989 annual meeting to its shareholders. Included with the notice was a copy of Milliken's current by-laws, the board resolution proposing the Amendments and Milliken's current Certificate of Incorporation. The notice was four pages long and included a number of recitals. It mentioned that the board had unanimously adopted the Amendments. Significantly, it also stated:

These amendments are proposed in lieu of all amendments previously proposed upon which the stockholders have not acted.

The notice did not explain the differences or similarities between the new Amendments and the previously withdrawn amendments. The notice stated that the board *would not* solicit proxies in connection with the scheduled 1989 meeting and cautioned:

[S]tockholders are encouraged to attend the meeting in person.... Pursuant to the corporation's by-laws, the chairman of the Board of the corporation, Roger Milliken, will preside at the meeting, and he and others will, among other things, endeavor to answer questions from stockholders concerning the matters to be voted upon, including the proposed amendments to the certificate of incorporation.

The Strouds then sued in the Court of Chancery to enjoin the 1989 annual meeting, claiming that the notice both omitted and misstated certain material facts. Plaintiffs also attacked the Amendments. This time, the trial court denied Stroud's request. *See Stroud v. Grace*, Del.Ch., C.A. No. 10719, Hartnett, V.C., slip op., 1989 WL 40829 (Apr. 21, 1989).

Milliken held its annual meeting on April 24, 1989 in Wilmington, Delaware. Of its eligible voters, 93% personally attended the meeting, and 97.8% of the shares entitled to vote were present. Most of the Strouds and their Wilmington counsel also participated in the meeting.

Roger Milliken chaired the meeting and presented a formal report of Milliken's business condition. Various charts were shown on a screen from a slide projector. When asked, Roger Milliken willingly answered questions concerning these materials. Nonetheless, citing a confidentiality policy Milliken adopted in 1987, Roger Milliken refused to answer any questions or release a copy of slides containing any con-

fidential or proprietary data. However, Milliken informed the shareholders that they could receive a copy of any such information if they first executed a confidentiality agreement. The Amendments were approved at the meeting by 78% of the shares entitled to vote.

After the meeting and vote, the Strouds again filed individual and derivative suits in the Court of Chancery against the defendants contesting the validity of the notice, the Amendments, and By-law 3. Plaintiffs argued that the board breached its duty of care and loyalty in approving and recommending the Amendments. They also argued that the Amendments were unfair to Milliken's shareholders by effectively entrenching Roger, Gerrish and Minot Milliken's control of the board.

The Strouds then moved for summary judgment. With one exception, the trial court *sua sponte* granted summary judgment in defendants' favor. *See Stroud II,* slip op. at 53. The Vice Chancellor granted summary judgment in favor of the Strouds by ruling that By-law 3 was unfair to Milliken's shareholders. *Id.* at 29–31.

## II.

We first consider the Strouds' procedural claim before addressing the substantive merits of this appeal. Plaintiffs argue that the trial court erred as a matter of law in *sua sponte* granting summary judgment in favor of the defendants. The Strouds also contend that the trial court failed to consider the evidence in a light most favorable to them because the record supposedly contained disputed issues of material fact.

■ Our review of the trial court's grant of summary judgment to the defendants is *de novo. See Gilbert v. El Paso Co.,* Del.Supr., 575 A.2d 1131, 1141 (1990). The Court must analyze the entire record, including the trial court's opinion, the pleadings, depositions and other relevant evidence contained in the record. *Id.* at 1142; *Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840, 844 (1987). We treat all facts in a light most favorable to the non-moving party. We will draw our own factual conclusions if the trial court's

rulings are clearly wrong and we will decide the summary judgment issue only if there is no dispute of material facts. *Id.* We examine all legal issues to determine whether the trial court "erred in formulating or applying legal precepts." *Gilbert,* 575 A.2d at 1142.

■ A review of the record indicates that the trial court properly granted summary judgment to the defendants. In *Bank of Delaware v. Claymont Fire Co. No. 1,* Del.Supr., 528 A.2d 1196, 1199 (1987), we found that in the interests of judicial economy, Chancery Court Rule 56 gives that court the inherent authority to grant summary judgment *sua sponte* against a party seeking summary judgment. *Id.* We explained that "[t]he form of pleadings should not place a limitation upon the court's ability to do justice." *Id. Claymont Fire* also recognized that the Court of Chancery should only *sua sponte* grant summary judgment against a party seeking summary judgment when the "state of the record is such that the non-moving party is clearly entitled to such relief...." *Id.*

In essence, plaintiffs' claim that the record was insufficient for a *sua sponte* grant of summary judgment in the defendants' favor merely reargues the merits of plaintiffs' substantive claims—a boot-strap argument at best. In our opinion, the record adequately supports the trial court's decision. This appeal must turn on the merits of plaintiffs' substantive claims, not empty procedural objections.

## III.

The Strouds launch a broad-brush attack on Milliken's board, claiming their decision to approve and recommend the Amendments to the shareholders expressly violated their fiduciary duty of care, and implicitly, the duty of loyalty. Plaintiffs further argue that the Court of Chancery erred in failing to apply the heightened standard of *Unocal. See Unocal,* 493 A.2d at 954–55.

The Strouds ascribe little importance to the fact that 78% of Milliken's shareholders—virtually all but the Strouds—ap-

proved the Amendments. Plaintiffs claim that the alleged inadequacies of the notice of the 1989 annual meeting rendered the shareholder vote a nullity.

◼ Under Delaware law a fully informed shareholder vote in favor of a disputed transaction ratifies board action in the absence of fraud. *See Bershad,* 535 A.2d at 846; *Smith v. Van Gorkom,* Del. Supr., 488 A.2d 858, 890 (1985); *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 703 (1983); *Michelson v. Duncan,* Del. Supr., 407 A.2d 211, 224 (1979); *Gottlieb v. Heyden Chemical Corp.,* Del.Supr., 91 A.2d 57, 58–59 (1952); *Gerlach v. Gillam,* Del.Ch., 139 A.2d 591, 593 (1958).

◼ The Vice Chancellor applied the presumption of the "traditional business judgment rule." *Stroud II,* slip op. at 19. The trial court ultimately concluded that the board did not violate any fiduciary duties. *Id.* at 21. In rejecting the *Unocal* analysis, the Vice Chancellor stated:

> The amendments here could not have been adopted in response to some threat to corporate policy and effectiveness because management controls, and will control for the foreseeable [sic] future, well over 50% of the stock of Milliken.
>
> The plaintiffs have also failed to show that the Charter and By-law amendments were adopted as defensive measures. The plaintiffs merely speculate that these Charter and By-law amendments tend to ensure the future control of Roger, Gerrish and Minot Milliken over Milliken & Company. They, however, have failed to adduce any facts supporting their assertions.

*Id.* at 19. The Strouds contend that this ruling "is contrary to Delaware law," and construes *Unocal* too narrowly. Plaintiffs correctly state that *Unocal* applies whenever a board "perceives a threat" to control and takes defensive measures in response to the threat. Citing to various sections of the record, including: (1) the board's supposed decision to pursue the GOA to respond to a generalized "threat" to the Milliken family's control; and (2) a provision in a subsequently revoked charter amendment identifying a threat to control, plain-

tiffs argue that the board was reacting to a threat when it approved the Amendments.

In our opinion this record does not justify application of *Unocal* and its progeny. The Strouds' analysis of *Unocal* is contrary to Delaware law.

*Unocal* reaffirmed the application of the business judgment rule in the context of a hostile battle for control of a Delaware corporation where board action is taken to the exclusion of, or in limitation upon, a valid stockholder vote. *See Unocal,* 493 A.2d at 954; *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 627 (1984). *Unocal* recognized that directors are often faced with an "inherent conflict of interest" during contests for corporate control "[b]ecause of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders...." *Unocal,* 493 A.2d at 954. *Unocal* thus requires a reviewing court to apply an enhanced standard of review to determine whether the directors "had reasonable grounds for believing that a danger to corporate policy and effectiveness existed ..." and that the board's response "was reasonable in relation to the threat posed." *Id.* at 955. If the board action meets the *Unocal* standard, it is accorded the protection of the business judgment rule. *Id.*

The scrutiny of *Unocal* is not limited to the adoption of a defensive measure during a hostile contest for control. In *Moran v. Household International, Inc.,* Del.Supr., 500 A.2d 1346 (1985), we held that *Unocal* also applied to a preemptive defensive measure where the corporation was not under immediate "attack." *Id.* at 1350–53. Subsequent cases have reaffirmed the application of *Unocal* whenever a board takes defensive measures in reaction to a perceived "threat to corporate policy and effectiveness which touches upon issues of control." *Gilbert,* 575 A.2d at 1144; *see Paramount Communications, Inc. v. Time, Inc.,* Del.Supr., 571 A.2d 1140, 1152 (1990); *Mills Acquisition Co. v. MacMillan, Inc.,* Del.Supr., 559 A.2d 1261, 1287 (1989).

Inherent in all of the foregoing principles is a presumption that a board acted in the absence of an informed shareholder vote ratifying the challenged action. This significant distinction, in addition to the fact that Milliken faced no threat to corporate policy and effectiveness, or to the board's control, is fatal to plaintiffs' *Unocal* arguments.

Here, there is no evidence that the board adopted the Amendments as defensive measures. *See Stroud II,* slip op. at 19. The Strouds' contention that the GOA was primarily designed as a takeover defense is untenable. That was a matter of private contract between the shareholders themselves and their company. All shareholders were free to accept the GOA or reject it. The plaintiffs chose the latter course. The shareholders of many privately-held corporations, like Milliken, enter into contracts, like the GOA, to preserve family ownership and give themselves a right of first refusal to purchase a company's shares. *See* 12 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5461.1 (perm. ed. rev. vol. 1985); 1 F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Close Corporations* § 7.24 (3d ed. 1987); 8 *Del.C.* § 202. The Strouds offer no material proof to support their claim that the board adopted Article Eleventh (c) to thwart a takeover. Any defensive effects of the GOA and the Amendments themselves were collateral at best.

Significantly, the record shows beyond peradventure that there was no threat to the board's control. Milliken was neither a takeover target, nor vulnerable to one. No Delaware court has applied *Unocal* in the absence of a danger to corporate policy and effectiveness, or as here, in the face of a valid shareholder vote ratifying the challenged board action. *See, e.g., Gilbert,* 575 A.2d at 1143–44; *Paramount,* 571 A.2d at 1152 (upholding trial court's decision to apply traditional business judgment rule to Time–Warner merger transaction before bidder appeared and trial court's decision to assess amended agreement under *Unocal* after parties received hostile bid); *Moran,* 500 A.2d at 1349, 1356 (upholding poi-

son pill adopted as a pre-planned defensive measure because the company was "vulnerable" to a takeover).

The record clearly indicates, and Stroud concedes, that over 50% of the outstanding shares of Milliken are under the direct control of Roger, Minot and Gerrish Milliken. These directors controlled the corporation in fact and law. *Aronson v. Lewis,* Del. Supr., 473 A.2d 805, 815 (1984) (citing *Kaplan v. Centex Corp.,* Del.Ch., 284 A.2d 119, 123 (1971)). This obviates any threat contemplated by *Unocal,* and is buttressed by the further fact that at least 70% of Milliken's shareholders supported the GOA.

■ Thus, the Court of Chancery properly analyzed the board's decision to adopt and recommend the Amendments to the shareholders under the presumption of the business judgment rule. *See Aronson,* 473 A.2d at 812. Under such circumstances the burden is on the plaintiff to overcome the presumption of the rule. *See Mills,* 559 A.2d at 1279; *Van Gorkom,* 488 A.2d at 872; *Aronson,* 473 A.2d at 812. Unfortunately, however, that does not end the matter. Since an overwhelming majority of Milliken's shareholders, even excluding those shares owned or controlled by Roger, Gerrish and Minot Milliken, approved the disputed Amendments at the 1989 annual meeting, standards governing the board's action leading to a fully informed stockholder vote have little relevance to the ultimate issue. Thus, our standard of review is linked to the validity of the shareholder vote.

## IV.

■ In the absence of fraud, a fully informed shareholder vote in favor of even a "voidable" transaction ratifies board action and places the burden of proof on the challenger. *See Bershad,* 535 A.2d at 846; *Van Gorkom,* 488 A.2d at 890; *Weinberger,* 457 A.2d at 703; *Michelson,* 407 A.2d at 224; *Gottlieb,* 91 A.2d at 58–59; *Saxe v. Brady,* Del.Ch., 184 A.2d 602, 610 (1962); *Gerlach,* 139 A.2d at 593. The fact that controlling shareholders voted in favor of the transaction is irrelevant as long as

they did not breach their fiduciary duties to the minority holders. *Unocal*, 493 A.2d at 958; *Bershad*, 535 A.2d at 845; *see Ringling Bros.—Barnum & Bailey Combined Shows, Inc. v. Ringling*, Del.Supr., 53 A.2d 441, 447 (1947). There is no proof whatever of any such breach in this case. The burden, however, remains on those relying on the vote to show that all material facts relevant to the transaction were fully disclosed. *Weinberger*, 457 A.2d at 703; *Cahall v. Lofland*, Del.Ch., 114 A. 224, 234 (1921).

■ Here, 78% of Milliken's shareholders adopted the disputed Amendments at the 1989 annual meeting. In the absence of proof by plaintiffs that the disclosures were misleading or inadequate, or that the actions of the board involved fraud, waste or other misconduct which were not ratified by unanimous vote of the stockholders, this ends the matter. *See, e.g., Keenan v. Eshleman*, Del.Supr., 2 A.2d 904, 909 (1938).[1]

■ Plaintiffs allege a breach of the "duty of candor." Preliminarily we note that the term "duty of candor" does not import a unique or special rule of disclosure. It represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action. That is the standard and duty of disclosure in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), as fully adopted by this Court in *Rosenblatt v. Getty Oil Co.*, Del. Supr., 493 A.2d 929, 944 (1985). Such a materiality standard has been a mainstay of Delaware law for decades. *See Cahall*, 114 A. at 234. Thus, the term "duty of candor" has no well accepted meaning in the disclosure context. Its use is both con-

fusing and imprecise given the well-established principles and duties of disclosure that otherwise exist. Thus, it is more appropriate for our courts to speak of a duty of disclosure based on a materiality standard rather than the unhelpful terminology that has crept into Delaware court decisions as a "duty of candor." This is entirely consistent with our prior statements of Delaware law regarding the duty and standard of disclosure. *See id.; see also Rosenblatt*, 493 A.2d at 944; *Van Gorkom*, 488 A.2d at 890.

The Strouds argue that: (1) the directors failed to explain the differences between the 1989 amendments and the previously proposed and withdrawn amendments; (2) the board misstated this Court's resolution of the first *Stroud* decision; (3) the board misleadingly stated that it consisted of a majority of outside directors; (4) the board's disclosure of financial data and its responses to shareholder inquiries at the annual meeting was hasty and inadequate; and finally (5) the board falsely informed the shareholders that an independent valuation of the corporation's shares was accurate. The trial court considered these claims and found them meritless. *See Stroud II*, slip op. at 37–44. The Vice Chancellor, however, analyzed the Strouds' pre-meeting disclosure claims within a novel legal framework. *Id.* at 32–34. Due to the unique manner in which the trial court examined Strouds' disclosure claim, we must first address important legal questions implicating the relationship between the General Corporation Law and a director's common law fiduciary duties.

### A.

The trial court noted that the board did not solicit proxies for the 1989 annual meeting. *Stroud II*, slip op. at 31. The Vice Chancellor also recognized that the

---

**1.** We recognize the long-standing principle that to comport with its fiduciary duty to disclose all relevant material facts, a board is not required to engage in "self-flagellation" and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter. *See Michelson v. Duncan*, Del.Ch.,

386 A.2d 1144, 1155 (1978), *aff'd in part*, Del. Supr., 407 A.2d 211, 222 (1979). Nonetheless, when a board allegedly breaches its fiduciary duties, we will not uphold shareholder ratification unless the board discloses *all* material facts relevant to the issue at hand. *Weinberger*, 457 A.2d at 703.

board "complied" with the notice provisions of 8 *Del.C.* §§ 222 & 242(b)(1) when it mailed the notice of the 1989 annual meeting. *Id.* at 33–34. Nonetheless, observing the well-established fiduciary duty of disclosure, couched as a duty of "candor," and citing this Court's previous decision in *Stroud I,* the Vice Chancellor found:

> This duty of complete candor cannot be avoided by the directors by a decision not to solicit proxies and to merely comply with the statutory notice provisions of 8 *Del.C.* § 222 and 242.

*Id.* at 32. On appeal, the defendants attack the Vice Chancellor's decision to extend this duty of disclosure into a substantive requirement which supervenes 8 *Del.C.* §§ 222(a) & 242(b)(1). Defendants claim that extending the duty of disclosure violates the clear meaning, purpose and intent of the corporation law. Defendants also argue that the Vice Chancellor's ruling is contrary to well-established legal practice for privately-held corporations.

### B.

We first address the trial court's decision to extend the duty of disclosure in this factual context beyond that required by statute. The Vice Chancellor applied a novel legal analysis to test the Strouds' disclosure claims. We analyze all legal issues *de novo* to determine whether the trial court "erred in formulating or applying legal precepts." *Gilbert,* 575 A.2d at 1142; *see Fiduciary Trust Co. v. Fiduciary Trust Co.,* Del.Supr., 445 A.2d 927, 930 (1982).

■ Delaware law imposes upon a board of directors the fiduciary duty to disclose fully and fairly all material facts within its control that would have a significant effect upon a stockholder vote. *See, e.g., Rosenblatt,* 493 A.2d at 944–45; *Van Gorkom,* 488 A.2d at 889–90; *Lynch v. Vickers Energy Corp.,* Del.Supr., 383 A.2d 278, 279, 281 (1977). The board is not required to disclose all available information. As we explained in *Rosenblatt,* the materiality standard of *TSC Industries, supra,* requires disclosure of all facts which " 'would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Rosenblatt,* 493 A.2d at 944 (quoting *TSC Industries,* 426 U.S. at 449, 96 S.Ct. at 2132); *see also Van Gorkom,* 488 A.2d at 864.

The directors' duty to disclose all material facts in connection with contemplated shareholder action does not exist in a vacuum. The provisions of the Delaware General Corporation Law also establish mandatory disclosures in certain circumstances. In a case like this, where a board issues a notice of annual meeting with the intention of amending its certificate of incorporation, the General Corporation Law requires two separate disclosures. Section 222(a) provides in pertinent part:

> Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, date and hour of the meeting....

8 *Del.C.* § 222(a). Section 242(b)(1) provides in part that:

> Every amendment authorized by subsection (a) of this section shall be made and effected in the following manner:
>
> (1) If the corporation has capital stock, its board of directors shall adopt a resolution setting forth the amendment proposed, declaring its advisability, and either calling a special meeting of the stockholders entitled to vote in respect thereof for the consideration of such amendment or directing that the amendment proposed be considered at the next annual meeting of the stockholders. Such special or annual meeting shall be called and held upon notice in accordance with § 222 of this title. The notice shall set forth such amendment in full or a brief summary of the changes to be effected thereby, as the directors shall deem advisable.

8 *Del.C.* § 242(b)(1). Significantly, the General Corporation Law does not require any further disclosures in the absence of a proxy solicitation.

The Vice Chancellor attempted to fill this void by imposing the so-called duty of candor. While recognizing that Delaware

precedent suggests that a board has no duty to disclose anything beyond the requirements of 8 *Del.C.* §§ 222(a) & 242(b)(1) when proxies are not solicited, the Vice Chancellor held:

> Under the rule in [*Stroud I*], however, it is *clear* that the directors of Milliken owed the Milliken shareholders a fiduciary duty of disclosure with complete candor which was not fulfilled by the mere compliance with the statutory mandate, notwithstanding that no proxies were solicited.

*Stroud II,* slip op. at 34 (emphasis added). The Vice Chancellor cited no other authority or rationale to justify this conclusion.

*Stroud I* did not change the law. Indeed, *Stroud I* recognized that the issue of "whether the defendant directors of a private company may, under the operative facts, avoid a common law duty of candor by not soliciting proxies and by simply complying with the statutory notice requirements of 8 *Del.C.* §§ 222 and 242" was "novel and important" to the corporation law. *Stroud I,* 552 A.2d at 481. *Stroud I,* however, turned on the fact that the case was not ripe for adjudication. Nothing more was, or could have been, decided since to do so would have amounted to the issuance of an impermissible advisory opinion. *Stroud I,* 552 A.2d at 479–82. Under the circumstances, reliance on *Stroud I* to establish a new substantive principle of law is misplaced.

All of our previous decisions involving disclosure requirements, and subsequent shareholder ratification, involved proxy solicitations. In the absence of that circumstance, questions of disclosure beyond those mandated by statute become less compelling. Milliken is a privately-held, non-public, corporation which is not registered under the Securities Act of 1933 or subject to the proxy requirements of the Securities Exchange Act of 1934. 15 U.S.C. §§ 77a & 78a. Accordingly, it is exempted from the federal statutes, rules and regulations governing disclosures in proxy materials. *See* 15 U.S.C. § 78n(a); 1 Thomas L. Hazen, *The Law of Securities Regulation* § 11.2 (2nd ed. 1990). Thus,

what we say here is limited to non-public, privately-held corporations.

The general disclosure requirements under federal and Delaware law arise from a circumstance that is absent here. Realities of modern corporate life have all but gutted the myth that shareholders in large publicly held companies personally attend their annual meetings. As one well-known commentator succinctly stated:

> The widespread distribution of corporate securities, with the concomitant separation of ownership and management, puts the entire concept of the stockholders' meeting at the mercy of the proxy instrument.

Louis Loss, *Fundamentals of Securities Regulation* 449 (2nd ed. 1988); *see also* Daniel L. Goelzer & J. Robert Brown, Jr., *Preparation of Proxy Materials, reprinted in,* R. Franklin Balotti et al., *Meetings of Stockholders* 51 (1989); Melvin A. Eisenberg, *Access to the Corporate Proxy Machinery,* 83 Harv.L.Rev. 1489, 1490 (1970) ("proxy voting has become the dominant mode of shareholder decision making in publicly held corporations").

As a result, Congress enacted Section 14(a) of the Securities Exchange Act of 1934 to give the Securities and Exchange Commission ("SEC") authority to promulgate rules with a view to prevent abuses in the proxy system "which have frustrated free exercise of the voting rights of stockholders." H.R.Rep. No. 1383, 73d Cong., 2d Sess. 13–14 (1934); *see also J.I. Case Co. v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). In observing its Congressional mandate the SEC has adopted a "basic philosophy ... of disclosure." Loss, *supra,* at 453.

■ Delaware also imposes a duty of full disclosure in assessing the adequacy of proxy materials under state law. *See Bershad,* 535 A.2d at 846; *Rosenblatt,* 493 A.2d at 945; *Van Gorkom,* 488 A.2d at 890; *Weinberger,* 457 A.2d at 708; *Michelson,* 407 A.2d at 222; *Lynch,* 383 A.2d at 280 (tender offer circular); *Gerlach,* 139 A.2d at 591. Two factors explain our emphasis on the adequacy of disclosures in proxy statements. First, as mentioned, is

the fact that large public corporations must solicit proxies when seeking a shareholder vote. Second, and more importantly, Delaware, like Congress, has recognized that proxy voters generally do not attend shareholder meetings. We require proxy voters to have all material information reasonably available before casting their votes. Thus, proxy materials insure that directors do not use their "special knowledge" to their own advantage "and to the detriment of the stockholders." *Weinberger*, 457 A.2d at 711; *Lynch*, 383 A.2d at 281; *Lank v. Steiner*, Del.Supr., 224 A.2d 242, 244 (1966); *see also, Van Gorkom*, 488 A.2d at 864.

The same concerns that underlie both the federal disclosure system and our own common law fiduciary duty of disclosure are not implicated in a case like this. This does not lessen a board's fiduciary duty of disclosure. Clearly, for a notice to comply with §§ 222(a) and 242(b)(1) the information set forth, including the proposed action, must be stated with reasonable clarity and be unambiguous. The emphasis of such disclosure, however, is shifted to that which occurred at the annual meeting.

Our conclusion that, in this case, the duty of disclosure does not go beyond the information required by 8 *Del.C.* §§ 222(a) & 242(b)(1) is further supported by the plain language of the corporation law. Section 222(a) delineates the information which must be disclosed in a notice of annual meeting. Unlike the laws of at least two other states, however, Section 222(a) does not require the board to disclose the purpose of, or matters to be discussed at, regularly scheduled annual meetings. *Compare* 8 *Del.C.* § 222(a) *with* Cal.Corp. Code § 601 (West 1990) *and* Nev. Rev.Stat. § 78.370 (1991).

When a company seeks to amend its certificate of incorporation, Section 242(b)(1) requires the board to conform to the notice provisions of Section 222, obligating the board to include a resolution declaring the advisability of the amendment and "as the directors shall deem advisable," either a copy of the proposed charter amendment in full, or a "brief summary of the changes." 8 *Del.C.* § 242(b)(1).

 The trial court's extension of the duty of disclosure beyond that mandated by statute effectively amends the law. It is important that there be certainty in the corporation law. We emphasize that the Court of Chancery must act with caution and restraint when ignoring the clear language of the General Corporation Law in favor of other legal or equitable principles.[2] *See Staar Surgical Co. v. Waggoner*, Del.Supr., 588 A.2d 1130, 1137 n. 2 (1991); *Alabama By–Products Corp. v. Neal*, Del.Supr., 588 A.2d 255, 258 n. 1 (1991).

 Thus, under all of the circumstances here, the board had no duty to disclose anything beyond the requirements of section 242(b)(1) of the General Corporation Law. The board complied with its statutory duty and included with its notice both the certificate of incorporation and the proposed amendments. Plaintiffs argue that section 242(b)(1) should be read in the conjunctive, a wholly unpersuasive contention. Nor is the board's conduct inequitable. The Strouds cannot prove that the board was acting inequitably and attempting to confuse the shareholders. In sum, given the board's compliance with the corporation law through clear and unambiguous statements of the proposals to be considered at the meeting, and the Strouds' failure to prove that the board acted inequitably, we need not discuss the matter further. There is no merit to any of the plaintiffs' other myriad disclosure claims, all of which were fully addressed and properly decided by the Vice Chancellor.

Finally, we consider the Strouds' contention that the board and Roger Milliken vio-

---

2. The Strouds failed to prove that the board deliberately eschewed proxy voting in favor of statutory notice to inequitably manipulate the shareholder vote. *See Schnell v. Chris–Craft*, Del.Supr., 285 A.2d 437, 439 (1971). The Vice Chancellor thus awarded summary judgment in favor of the defendants on this issue. *See Stroud II*, slip op. at 46–47. Plaintiffs do not specifically contest this aspect of the Vice Chancellor's ruling on appeal and effectively waive that claim.

lated their duty of disclosure by their alleged misstatements and omissions at the annual meeting respecting a report valuing Milliken's shares. The Washington, D.C. law firm of Ivins, Phillips & Barker ("IP & B") prepared the report for the company. Plaintiffs argue that at the annual meeting: (1) the board misleadingly asserted that the IP & B valuation reflected the fair market value of Milliken's shares; (2) the board failed to reveal that the IP & B valuation considered that Milliken's shares had little marketability and reflected use of a minority discount; (3) Roger Milliken misleadingly stated that IP & B was "in the business of valuing the shares of privately-held corporations;" and (4) Roger Milliken misleadingly compared the IP & B valuation against certain defective stock indices. Stroud contends that the IP & B report is material because the proposed Amendments would make the sale of Milliken's shares "impossible."

■ The trial court considered the Strouds' claims and ruled that they were both irrelevant and immaterial. *See Stroud II*, slip op. at 41–44. We agree. Even if Roger Milliken or the board erroneously stated certain facts concerning the IP & B valuation, we do not find that they are in any way material to the shareholder vote. We also note that plaintiffs never signed the GOA. Milliken apparently used the IP & B stock valuation to price its first refusal option. We agree with the Vice Chancellor's finding that the IP & B valuation thus had no relevance to plaintiffs' suit. *See Stroud II*, slip op. at 43.

Indeed, in what appears to be a recurring pattern of innuendo, plaintiffs completely fail to explicate their contentions with specific record evidence and legal argument. After reviewing the text of the Amendments, we do not see how they make the sale of Milliken's shares "impossible." In our opinion plaintiffs' final "disclosure" claim is meritless.

## V.

Turning to the matter of confidentiality, the Vice Chancellor noted that, as a privately-held corporation, Milliken had an interest in preserving confidentiality respecting its affairs. *Stroud II*, slip op. at 34, 50, 52. The court therefore found that "[t]he defendants' duty of disclosure with complete candor, however, must be applied in the context of Milliken's long-standing policy to maintain reasonable confidentiality." *Id.* at 34.

The trial court then analyzed the duty of disclosure in the context of Milliken's confidentiality policy in assessing Stroud's claim that the board was required to disclose to the shareholders "all relevant, confidential, financial information." *Id.* at 40. The Vice Chancellor ruled that the board was only obligated to send such information to shareholders who had first "executed a reasonable confidentiality agreement." *Id.* at 41. The trial court ultimately concluded that the board did not breach its duty of disclosure because the record did not show that the Milliken shareholders, who signed the confidentiality agreements, were deprived of material financial information. *Id.*

Plaintiffs claim that the trial court erred by considering Milliken's confidentiality policy as part of the disclosure analysis. The Strouds argue for a rule which would limit the inquiry to whether "all information that was material to Milliken shareholders was provided to them in a timely fashion."

A brief review of the Vice Chancellor's opinion clearly indicates that the trial court *only* considered Milliken's confidentiality policy in relation to the Strouds' specific claim that the board failed to disclose "all relevant, confidential, financial information," before or during the 1989 annual meeting. Before addressing the factual merits of Strouds' remaining disclosure claims, we first consider the relationship between the duty of disclosure, generally, and disclosure of confidential business information. The trial court's confidentiality analysis under the circumstances here presents a novel issue.

## A.

Coupled with the general fiduciary duty of disclosure is a competing principle that:

While it is the duty of the court to protect the rights of stockholders, it is equally their duty to safeguard the rights of the corporation as such.

*State ex rel. Cochran v. Penn–Beaver Oil Co.*, Del.Supr., 143 A. 257, 260 (1926) (en banc); *see State ex rel. Armour & Co. v. Gulf Sulphur Corp.*, Del.Super., 233 A.2d 457, 462 (1967), *aff'd*, Del.Supr., 231 A.2d 470 (1967); *see also Unocal*, 493 A.2d at 954 (citing cases). This Court has placed reasonable restrictions on shareholders' inspection rights in the context of suit brought under 8 *Del.C.* § 220, and has made disclosure contingent upon the shareholder first consenting to a reasonable confidentiality agreement. *See CM & M Group, Inc. v. Carroll*, Del.Supr., 453 A.2d 788, 794 (1982); *see, e.g., In re Petition of B & F Towing & Salvage Co.*, Del.Supr., 551 A.2d 45, 51 n. 7 (1988); *Radwick Pty., Ltd. v. Medical, Inc.*, Del.Ch., C.A. No. 7610, 1984 WL 8264, Berger, V.C., slip op. (Nov. 7, 1984); *Skouras v. Admiralty Enterprises, Inc.*, Del.Ch., 386 A.2d 674, 683 (1978); *Henshaw v. American Cement Corp.*, Del.Ch., 252 A.2d 125, 130 (1969). Indeed, in Section 220 cases, the courts have placed special emphasis on the need to protect privately-held corporations from the dissemination of confidential business information to "curiosity seekers." *CM & M Group*, 453 A.2d at 788; *cf. State ex rel. Rogers v. Sherman Oil Co.*, Del.Super., 117 A. 122, 126 (1922).

Where there is no inequitable conduct, and a board eschews the solicitation of proxies, the foregoing authorities provide a strong analogous basis for our decision here.

In applying our Section 220 jurisprudence to the unique facts of this case, we must balance the board's duty to disclose all available material information in connection with the contemplated shareholder vote against its concomitant duty to protect the corporate enterprise. In recognition of the essential nature of keeping financial information confidential in privately-held corporations like Milliken, it is entirely reasonable for a court to make the execution of a confidentiality agreement a prerequisite to disclosure of confidential informa-

tion to stockholders for purposes of any meeting where a vote is taken.

■ Thus, where one challenges the validity of a shareholder vote by claiming inadequate disclosure of confidential financial information in connection with that vote, the initial burden of proving "complete disclosure of material facts" relevant to the vote remains with the board of directors. *See Bershad*, 535 A.2d at 846; *Weinberger*, 457 A.2d at 703; *Rosenblatt*, 493 A.2d at 937. If the board withheld information in these special circumstances, it would still bear the burden of proving that: (1) the withheld information was confidential; and (2) the board only withheld the material confidential information from shareholders, who having been given notice and opportunity, failed to execute a reasonable confidentiality agreement.

To ensure maximum flexibility, we consider it inadvisable to adopt a bright-line test of reasonableness in this context. Certainly confidential information must not otherwise be publicly available. Finally, assuming the defendants meet their burden, the plaintiffs would be required, depending on the applicable standard, to prove that the board is not entitled to the protections of the business judgment rule, or that the challenged transaction was unfair. *See Bershad*, 535 A.2d at 846.

■ Under the circumstances, plaintiffs' claim that the board should have released all "relevant confidential, financial information" *before* the annual meeting is wholly meritless. Thus, we turn to their argument that the board breached its duty of disclosure *at* the 1989 annual meeting.

#### B.

■ The Strouds argue that under Milliken's By-law 52, its board is required to present "a full and clear statement of [Milliken's] business and condition." Plaintiffs contend that the board breached its duty of disclosure and violated its own by-law because, at the 1989 annual meeting, it "hastily" flashed indexed financial data on a screen from a slide projector. The Strouds

finally contend that Roger Milliken's "spontaneous" answers to shareholder inquiries at the meeting were insufficient to satisfy his duty of disclosure.

The trial court considered plaintiffs' claim and found it meritless. *Stroud II,* slip op. at 40–41. The court found no record support for Strouds' argument and granted summary judgment for the defendants. *Id.* at 41. We fully affirm that result.

During the annual meeting, Roger Milliken informed the shareholders that the company's financial information was confidential because of its sensitive nature, particularly given the keen interest of the company's competitors. He also informed the shareholders that the company had adopted a confidentiality policy in 1987 to provide shareholders with "current financial statements" upon a written request for the information and execution of a confidentiality agreement. He concluded: "[a]s a result I will announce today that written requests for financial information are available."

There is no doubt that some of the information presented at the 1989 annual meeting was confidential. Indeed, any "full and clear statement" of a privately-held corporation's "business condition" as required under Milliken By-law 52 is by its very nature confidential. Thus, the record is clear that the Milliken confidentiality policy encompassed the disclosure of current financial information subject to the execution of a confidentiality agreement.

The Strouds seem to have implicitly conceded the reasonableness of Milliken's confidentiality policy. At the 1989 annual meeting, plaintiffs' counsel questioned whether certain financial information flashed on a screen from a slide projector was confidential. Roger Milliken responded that some of the information may have been confidential. Plaintiffs' lead counsel then stated:

> [I]f it's confidential, then it should not be revealed, I guess, to people who have not signed the confidentiality agreement.

We find that under all the circumstances the Milliken confidentiality policy was reasonable both in its conception and application here. The Strouds' claims are without merit, and were properly rejected by the Court of Chancery.

## VI.

■ Since there was no breach of any fiduciary duty in connection with the shareholder vote at the 1989 annual meeting, a fully informed majority of the shareholders adopted the Amendments and effectively ratified the board's action. This shifts the burden of proof to the Strouds to prove that the transaction was unfair. *See Bershad,* 535 A.2d at 846; *Weinberger,* 457 A.2d at 703; *Van Gorkom,* 488 A.2d at 890; *Michelson,* 407 A.2d at 224; *Gottlieb,* 91 A.2d at 58–59; *Saxe,* 184 A.2d at 610; *Gerlach,* 139 A.2d at 593. They have utterly failed in that regard.

As the Court of Chancery first noted in *Gerlach,* it is well-settled that "an attack" on a fully informed majority decision to ratify a disputed action or transaction "normally must fail." *Gerlach,* 139 A.2d at 593. The Strouds' arguments are devoid of facts to support a claim that the board's approval and recommendation of the Amendments were unfair.

The Strouds' attack on the Amendments and the defendants' cross-appeal of the trial court's invalidation of By-law 3 both challenge the analytical framework employed by the Court of Chancery in resolving their respective claims. The choice of the applicable "test" to judge director action often determines the outcome of the case. *See AC Acquisitions Corp. v. Anderson, Clayton & Co.,* Del.Ch., 519 A.2d 103, 111 (1986).

### A.

The Vice Chancellor, relying on *Blasius Industries, Inc. v. Atlas Corp.,* Del.Ch., 564 A.2d 651 (1988), and *Aprahamian v. HBO & Co.,* Del.Ch., 531 A.2d 1204 (1987), examined the Amendments under an "intrinsic fairness" test. *Stroud II,* slip op. at 21. While the trial court concluded that the board had not breached its fiduciary duty, it nonetheless stated that:

Because ... the critical Charter and By-law amendments affect the Milliken shareholders' franchise, particularly their right to nominate directors, the validity of these amendments must be reviewed for their intrinsic fairness rather than considered pursuant to the business judgment rule.

*Id.* That ruling put the burden on the board to demonstrate a compelling justification for its decision to adopt and recommend the Amendments under the test of "scrupulous fairness." *Id.* at 22 (quoting *Blasius*, 564 A.2d at 661; *Aprahamian*, 531 A.2d at 1206–07).

The defendants contend that both *Blasius* and *Aprahamian* are distinguishable on their facts. They argue that a fairness review is only appropriate where the board breaches its fiduciary duty of loyalty to the corporation. They claim that the board did not act in its own self-interest, and the trial court should have considered the Amendments within the confines of the business judgment rule. The defendants alternatively argue that the Amendments could still withstand the exacting "intrinsic fairness" requirements.

The Strouds argue that these claims were properly decided under the rubric of *Blasius* and *Aprahamian*, when board action affects a shareholder vote. Stroud maintains that *Blasius* is applicable because the Amendments "directly impinge on the shareholder franchise."

 The Vice Chancellor's reliance on *Blasius* implicates a question of law. We examine such questions *de novo*. *See Gilbert*, 575 A.2d at 1142. We will overturn the trial court only if it "erred in formulating or applying legal precepts." *Id.* After considering the record, and in view of our conclusions earlier in this opinion, exculpating the defendants from a breach of fiduciary duty, we conclude that it was error to apply *Blasius* here.

### B.

In *Schnell v. Chris–Craft Industries, Inc.*, Del.Supr., 285 A.2d 437 (1971), this Court recognized that management may not inequitably manipulate corporate machinery to perpetuate "itself in office" and disenfranchise the shareholders. *Id.* at 439. The crux of *Schnell* is that:

> [I]nequitable action does not become permissible simply because it is legally possible.

*Id.*

*Schnell*'s broad holding spawned an entirely new line of Court of Chancery decisions. *Lerman v. Diagnostic Data, Inc.*, Del.Ch., 421 A.2d 906 (1980); *Aprahamian*, 531 A.2d at 1208; *Blasius*, 564 A.2d at 659–60; *Centaur Partners, IV, v. National Intergroup, Inc.*, Del.Supr., 582 A.2d 923, 927 (1990); *Stahl v. Apple Bancorp, Inc.*, Del.Ch., 579 A.2d 1115, 1122–23 (1990).

### C.

While we accept the basic legal tenets of *Stahl* and *Blasius*, certain principles emerge from those cases which are inextricably related to their specific facts. Almost all of the post-*Schnell* decisions involved situations where boards of directors deliberately employed various legal strategies either to frustrate or completely disenfranchise a shareholder vote. As *Blasius* recognized, in those circumstances, board action was intended to thwart free exercise of the franchise. There can be no dispute that such conduct violates Delaware law. *See Blasius*, 564 A.2d at 659–60 & n. 2; *see, e.g., Williams v. Sterling Oil of Okla.*, Del.Supr., 273 A.2d 264, 265 (1971); *Standard Power & Light Corp. v. Investment Assoc., Inc.*, Del.Supr., 51 A.2d 572, 580 (1947).

 The stringent standards of review imposed by *Stahl* and *Blasius* arise from questions of divided loyalty, and are well-settled. *See Gilbert*, 575 A.2d at 1144; *Paramount*, 571 A.2d at 1153–54; *Mills*, 559 A.2d at 1287; *Unocal*, 493 A.2d at 954–56; *see also Cheff v. Mathes*, Del.Supr., 199 A.2d 548, 556 (1964); *Bennett v. Propp*, Del.Supr., 187 A.2d 405, 409 (1962); *Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503, 510

(1939).[3] After reviewing the record in this case, we conclude that a *Blasius* analysis in connection with the validity of the Amendments and By-laws was inappropriate.

### D.

Clearly, the Milliken board did not face any threat to its control. Roger, Gerrish and Minot Milliken effectively owned or controlled a majority interest in the corporation. Furthermore, most of the other shareholders had executed the GOA. Thus, it cannot be said that the "primary purpose" of the board's action was to interfere with or impede exercise of the shareholder franchise.

More fundamentally, the Vice Chancellor ruled, and we agree, that a fully-informed majority of Milliken's shareholders ratified the Amendments. Therefore, the factual predicate of unilateral board action intended to inequitably manipulate the corporate machinery is completely absent here. *Cf. Centaur Partners*, 582 A.2d at 927. Milliken's shareholders, unlike those in both *Blasius* and *Aprahamian*, had a full and fair opportunity to vote on the Amendments and did so. The result of the vote, ceding greater authority to the board, does not under the circumstances implicate *Unocal* or *Blasius*.

In sum, after finding that the shareholder vote was fully informed, and in the absence of any fraud, waste, manipulative or other inequitable conduct, that should have ended the matter on basic principles of ratification. *Michelson*, 407 A.2d at 219–20.

### VII.

The trial court rejected the Strouds' contention that Article Eleventh (c) of the Amendments was unfair to Milliken's shareholders. *See Stroud II*, slip op. at 23–27. We agree that even under the more exacting analysis employed by the trial court, the Amendments are valid. Article Eleventh (c) establishes the qualifications for board membership. It provides for three categories of directors including:

**Category 1.** Individuals who have had *substantial* experience in line (as distinct from staff) positions in the management of *substantial* business enterprises or *substantial* private institutions, who are not officers, employees or stockholders, whether of record or beneficially, of the corporation or any of its subsidiaries. **Category 2.** Individuals who are beneficial stockholders of the corporation. For purposes of this Category 2, beneficial stockholders shall include beneficiaries of trusts which are record stockholders of the corporation.

**3.** Board action interfering with the exercise of the franchise often arose during a hostile contest for control where an acquiror launched both a proxy fight and a tender offer. Such action necessarily invoked both *Unocal* and *Blasius*. We note that the two "tests" are not mutually exclusive because both recognize the inherent conflicts of interest that arise when shareholders are not permitted free exercise of their franchise. *See, e.g., Shamrock Holdings, Inc. v. Polaroid Corp.*, Del.Ch., 559 A.2d 278, 285–86 (1989) (*Blasius* represents "specific expression" of *Unocal* test); *cf. Stahl v. Apple Bancorp, Inc.*, Del.Ch., C.A. No. 11510, Allen, C., slip op. at 16–18, 1990 WL 114222 (Aug. 9, 1990); *Davis Acquisition, Inc. v. NWA, Inc.*, Del.Ch., C.A. No. 10761, Allen C., slip op. at 3–4, 1989 WL 40845 (Apr. 25, 1989).

*Gilbert* should nonetheless resolve any ambiguity. It clearly holds that a reviewing court must apply *Unocal* where the board "adopts any defensive measure taken in response to some threat to corporate policy and effectiveness

which touches upon issues of control." *Gilbert*, 575 A.2d at 1144. This does not render *Blasius* and its progeny meaningless. In certain circumstances, a court must recognize the special import of protecting the shareholders' franchise within *Unocal*'s requirement that any defensive measure be proportionate and "reasonable in relation to the threat posed." *Unocal*, 493 A.2d at 955. A board's unilateral decision to adopt a defensive measure touching "upon issues of control" that purposefully disenfranchises its shareholders is strongly suspect under *Unocal*, and cannot be sustained without a "compelling justification." *See, e.g., In re Time Incorporated Shareholder Litigation*, Del.Ch., C.A. No. 10670, Allen, C., slip op. at 64–68, 1989 WL 79880 (July 14, 1989), *aff'd*, Del.Supr., 571 A.2d 1140 (1990) (court refused to apply *Blasius* to assess board's initial decision to withdraw merger proposal requiring shareholder vote in favor of proposal not requiring vote because board acted within its broad statutory authority).

**Category 3.** The chief executive officer the chief operating officer, and the president of the corporation, and any person who held any one or more of such offices. (Emphasis added).

The contested article also provides:

A majority of the board of Directors shall, at all times ... consist of persons qualified under [Article Eleventh] Category 1. At least 3 members of the Board of Directors shall, at all times ... be persons qualified under Category 2. No more than 2 individuals qualified under Category 3 may serve as a director at the same time. For purposes of this paragraph (c), an individual qualified under both Category 2 and Category 3 shall be deemed to be qualified under Category 2 alone.

The Strouds contend that the tripartite director qualifications violate 8 *Del.C.* § 141(b) because they are unreasonable and vague. Plaintiffs argue that the directors approved these provisions for the sole purpose of excluding all other people from Milliken's board except for Roger, Gerrish and Minot Milliken. The Strouds maintain that the amendment precludes them from ever serving as directors because: (1) they could never qualify under category three because of Milliken's anti-nepotism policy of excluding family members as employees; (2) they are excluded under category one because they are stockholders or beneficiaries of trust stockholders; and (3) the Strouds have been "totally excluded" from serving as category two directors.

### A.

Under our analysis, the burden falls on the Strouds to prove that the Amendments were not properly adopted or that their adoption was the product of fraud, manipulation or other inequitable conduct. Plaintiffs have not sustained that burden.

First, we disregard the Strouds' contention that the board unfairly "crafted" Article Eleventh to exclude all other candidates for office except Roger, Gerrish and Minot Milliken. We have already concluded that the shareholder vote ratified the Amend-ments, thus eliminating any possible taint on the board's decision. We will not revisit that proposition under the guise of the Strouds' scatter shot attack on the substance of the Amendments.

■■■ The Strouds challenge the validity of Article Eleventh (c), claiming that the category one qualifications are impermissibly vague. Plaintiffs focus on the language requiring category one directors to have "substantial experience in line ... positions" in "substantial business enterprises" or "substantial private institutions." The Strouds claim that the term "substantial" is *too* indefinite because it is not defined in the corporate charter.

The trial court was troubled that the meaning of "substantial" could vary depending on how the board defined the term. *Stroud II,* slip op. at 25–26. The Vice Chancellor nonetheless found that the board had the authority to define the term as long as they exercised their discretion fairly. *Id.* at 26. The trial court found that Strouds could not prove that the board interpreted category one unfairly, and declined to rule that it was *per se* unreasonable. *Id.* We agree.

Delaware corporations have broad authority to adopt charter provisions. 8 *Del.C.* § 102(b)(1) authorizes the inclusion in the certificate of incorporation "any provision creating, defining, limiting and regulating the powers of ... the directors" as long as they are "not contrary to the laws of this State." 8 *Del.C.* § 141(b) permits the certificate of incorporation or the bylaws to "prescribe other qualifications for directors." Finally, and quite significantly, no such charter amendment can be effected without stockholder approval. 8 *Del.C.* § 242(b). Thus, under all the circumstances we do not find that the term "substantial," as used in category one, to be unreasonably vague. *See, e.g., McWhirter v. Washington Royalties Co.,* Del.Ch., 152 A. 220, 224 (1930); *In re Gulla,* Del.Ch., 115 A. 317, 318 (1921). Moreover, our entire legal system makes liberal use of the word "substantial" and its derivatives as a qualifier in a broad range of rules and

statutes. *See, e.g.*, 8 *Del.C.* § 271; 11 *Del.C.* § 8402; Chancery Court Rules 4(h), 8(f), 56(d); Delaware Rules of Professional Conduct 1.8(c), 1.12(a) & (b), 8.3(a). The Strouds' vagueness claim again collapses into its own uncorroborated allegation that the directors adopted Article Eleventh (c) to exclude plaintiffs from the board. We have addressed the substance of these claims at length and find them to be completely unsubstantiated.[4]

## VIII.

Finally, we turn to the defendants' cross-appeal regarding validity of Milliken's By-law 3. That provision establishes, in part, the procedure for nominating candidates to Milliken's board. By-law 3 initially requires all board candidates to meet the qualifications mandated in Article Eleventh (c). By-law 3, section (d), requires a shareholder proposing a board candidate to include in his or her notice of nomination:

> [T]he proposed nominee's name, the principal occupation or employment of each such nominee, the nominee's written consent to nomination and to serving as a director if elected, *information establishing such nominee's fulfillment of any qualification requirements set forth in the Corporation's Certificate of Incorporation*, and such additional information with respect to such person as the Board of Directors may reasonably request.
>
> [T]he proposed nominee's name, the principal occupation or employment of each such nominee, the nominee's written consent to nomination and to serving as a director if elected, *information establishing such nominee's fulfillment of any qualification requirements set forth in the Corporation's Certificate of Incorporation*, and such additional information with respect to such person as

the Board of Directors may reasonably request.

(Emphasis added). By-law 3 then mandates that the shareholder deliver a copy of his or her notice to Milliken's secretary:

> [N]ot less than fourteen (14) nor more than fifty (50) days prior to the date of the meeting for the election of directors; provided, however, that if less than twenty-one (21) days' notice of the date of the meeting is given to stockholders, notice by a stockholder to be timely must be delivered or mailed not later than the close of the seventh (7th) day following the day on which notice of the date of the meeting was mailed to stockholders.

The By-law does not place a time limitation on the board's right to nominate board candidates. Once received, the board is required to circulate the notice of nominations with the notice of the annual meeting, or if received after the notice is circulated, By-law 3 provides that board should separately send a notice of nominations "as soon as practicable."

The most controversial subsection of By-law 3 concerns the board's ability to determine a candidate's qualifications under Article Eleventh (c) at any time before the election up to and including the annual meeting. By-law 3 subsection (f) provides:

> The Board of Directors, or if not feasible, the officer of the Corporation or other person *presiding at the meeting of stockholders shall determine any questions concerning whether nominations have been made in accordance with the provisions of this By-law 3 and whether such person has met the qualification requirements, if any, set forth in the Corporation's Certificate of Incorporation.* If such a determination is so made, the officer of the Corporation or other person presiding at the meeting of stockholders shall so declare to the meet-

---

**4.** Plaintiffs also seem to contend that Section one of Article Eleventh (c), when read with the rest of the amendment, is unfair because it requires a majority of the directors to be non-shareholders. The Vice Chancellor dismissed this claim outright. *See Stroud II,* slip op. 24–25. We agree with the Vice Chancellor's ruling. Section 141(b) of the corporation law clearly

contemplates that "[d]irectors need not be stockholders...." 8 *Del.C.* § 141(b). While, as the Vice Chancellor found, directors are often encouraged to own shares of their corporations, we will not adopt the Strouds' argument and eviscerate the clear language of the corporation law. *See Stroud II,* slip op. at 24–25.

ing and shall declare that any such nomination shall be disregarded.

(Emphasis added).

The trial court, applying *Blasius*, held that By-law 3 was "unreasonable and unfair, on its face." *Stroud II*, slip op. at 29. The Vice Chancellor noted that By-law 3 precluded the shareholders from knowing exactly what information to include in their notice of nomination "[b]ecause the category 1 criteria are not defined in Article Eleventh and are dependent on a determination by incumbent directors...." *Id.* The Vice Chancellor found that the board could effectively disenfranchise voters because subsection (f), when read in conjunction with the subsection limiting the shareholders' right to submit its notice of nomination not less than 14 days before the election, gave the directors the unfettered discretion to disqualify the shareholders' candidates without recourse. *Id.* at 30–31. The Vice Chancellor also noted that the same two subsections would effectively disenfranchise proxy voters whose candidates could hypothetically be disqualified at the annual meeting. *Id.*

### A.

The defendants argue that the trial court erred as a matter of law when it ruled that the By-law was facially invalid. They claim that the corporation law vests the directors with the authority to administer elections, and that the trial court should not have assumed on a purely speculative basis that the incumbent directors would exercise their powers inequitably. Defendants also contend that the shareholders are in a better position with By-law 3 than without it. They claim that the time limits of By-law 3 ensure that stockholders are not limited to making board nominations from the floor of the annual meeting where the directors could refuse to recognize the shareholders' nominations. Finally, defendants cite to similar By-laws of other Delaware corporations and contend that the Vice Chancellor's ruling upsets established Delaware practice.

The Strouds argue that the Vice Chancellor's reliance on *Blasius* was correct be-cause By-law 3 "has caused and will continue to cause injury" to Milliken's shareholders. Plaintiffs basically conclude with their repetitive charge that By-law 3 was merely part of the directors' intentional "scheme" to consolidate their control at the expense of the shareholders' franchise.

### B.

The trial court's invalidation of By-law 3 by granting the Strouds' motion for summary judgment presents an issue of law for review. *Gilbert*, 575 A.2d at 1142; *see Rohner v. Niemann*, Del.Supr., 380 A.2d 549, 552 (1977). After reviewing the entire record, we conclude that it was error to invalidate By-law 3.

■ Again, we observe that *Blasius* had no application here. Given the fully informed shareholder vote adopting Article Eleventh (c) at the 1989 annual meeting, there was no reason to apply *Blasius*. Plaintiffs utterly failed to prove that the By-laws were attributable to an improper corporate purpose.

The trial court ruled that Article Eleventh (c) was not unfair and did not unreasonably interfere with the shareholders' franchise. *Stroud II*, slip op. at 26. The Vice Chancellor refused to rule that the disputed article, which establishes the criteria for category one directors to include individuals having *"substantial"* experience in certain matters, was unfair *"per se."* *Id.* Instead, the trial court held that the board was entitled to construe the meaning of "substantial" "if the determination [was] fairly made." *Id.* Parity of reasoning, therefore, required that By-law 3's reference to the Article Eleventh (c) qualifications likewise did not render it unreasonable *per se.* The board should have a reasonable opportunity to interpret this otherwise valid by-law in a fair and proper manner.

■ There was no basis to invalidate By-law 3 upon some hypothetical abuse. Plaintiffs totally failed to show that By-law 3 "caused and will continue to cause injury" to Milliken's shareholders. If anything, the board respected W.B. Dixon

Stroud, Jr.'s nominees and circulated a list of his candidates to the shareholders prior to the 1989 annual meeting. The shareholders overwhelmingly rejected Stroud's nominees. That is not an injury. It is a reality flowing from a proper turning of the wheels of corporate democracy—and nothing more—a point which the plaintiffs totally and repeatedly missed throughout this litigation.

There was no basis to invoke some hypothetical risk of harm rather than an examination of the board's proven, and entirely proper, conduct. *See, e.g., Staar Surgical Co. v. Waggoner*, Del.Supr., 588 A.2d 1130, 1137 n. 2 (1991); *Alabama By-Products Corp. v. Neal*, Del.Supr., 588 A.2d 255, 258 n. 1 (1991). It is not an overstatement to suggest that every valid by-law is always susceptible to potential misuse. Without a showing of abuse in this case, we must reverse the trial court's decision and uphold the validity of By-law 3.[5] The validity of corporate action under By-law 3 must await its actual use. *See Moran*, 500 A.2d at 1357.

Accordingly, the judgment of the Court of Chancery is AFFIRMED in part and REVERSED in part.

---

5. Our decision does not leave plaintiffs without a remedy. They can always file an action in the Court of Chancery under 8 *Del.C.* § 225 if they want to contest the board's *actual* conduct in relation to any future corporate election of a Milliken director.